**UNITED STATES of America**

v.

**Irvin BETHEA.**

**Crim. A. No. 90–0328–003 (HAA).**

United States District Court,
D. New Jersey.

Dec. 21, 1992.

Carl J. Herman, Livingston, NJ, for defendant Irvin Bethea.

Alberto Rivas, Donna Krappa, Asst. U.S. Attys., Newark, NJ, for U.S.

## OPINION

HAROLD A. ACKERMAN, District Judge:

On June 16, 1989, Mutah Sessoms was brutally murdered.

A year later, several individuals, alleged to be members of a drug gang responsible for Sessoms' death, were indicted by a federal grand jury for violating federal drug and racketeering laws (the Racketeer Influence and Corrupt Organizations Act, or "RICO", 18 U.S.C. § 1962). Irvin Bethea, now before the Court for sentencing, was one of those individuals. The grand jury charged Mr. Bethea with the following Counts of the Indictment:

—Count 1: conspiracy to conduct from March 1, 1987 until January 1, 1990, an enterprise through racketeering;

—Count 2: numerous acts of racketeering from March 1, 1987 until January 1, 1990;

—Count 4: conspiracy to possess with intent to distribute more than 5 kilograms of cocaine, from March 1, 1987 until January 1, 1990;

—Count 6: possession with intent to distribute 3 kilograms of cocaine on or about November 25, 1988.

Count 2 of the Indictment charged Mr. Bethea with three (3) distinct predicate acts. One of those acts (Act 3) was the murder of Mutah Sessoms.

On May 13, 1992, the jury returned a verdict against Mr. Bethea. Irvin Bethea was convicted of all the Counts he was charged with. However, a hung jury was declared on Act 3 of Count 2 of the Indictment. In other words, Mr. Bethea was neither found guilty nor acquitted of the murder of Mutah Sessoms. Rather, the jury was deadlocked on whether the government had proven, beyond a reasonable doubt, that Mr. Bethea was responsible for Sessoms' murder.

Subsequent to the conviction of Mr. Bethea, United States Probation Officer Thomas Larson prepared a Presentence Report in accordance with Fed.R.Crim.P. 32(c). The offense level was calculated based on the predicate racketeering acts for which Mr. Bethea was convicted, namely Conspiracy with Intent to Distribute Cocaine and Possession with Intent to Distribute in Excess of 5 Kilograms of Cocaine. The Probation Officer arrived at an offense level of 39. The exposure for such an offense level is 324—

405 months imprisonment, and the probation officer recommended 360 months.

This matter now comes before the Court on the government's objection to the probation department's computation of Mr. Bethea's total offense level. Specifically, the government contends that Mr. Bethea's role in the murder of Mutah Sessoms was proven at trial by a preponderance of the evidence, and that therefore the murder should be taken into account in computing the total offense level under the guidelines. If the murder is taken into account, the government argues that the total offense level would be calculated at level forty-three (43). Since the offense level of (43) mandates that a sentence of life imprisonment be imposed, the Government calls for the court to sentence Mr. Bethea to life imprisonment.

### DISCUSSION

### I. The Government's Motion

To analyze the government's argument, I must address three issues: (1) whether the guideline for violations of RICO permits the court to take into account acts with which the defendant was charged but not convicted; (2) if so, whether the act of murdering Mutah Sessoms constitutes "relevant conduct" under the guidelines that may be taken into consideration; (3) if so, whether the government has proven under the relevant evidentiary standard that Mr. Bethea murdered Mutah Sessoms.

I address these issues in turn.

### A. RICO and the Underlying Offenses

The sentencing range in this case is governed by the Sentencing Reform Act of 1984, which authorizes the United States Sentencing Commission to propagate Sentencing Guidelines. These guidelines mandate the judge to sentence a defendant in accordance with a calculation of the defendant's total "offense level".

Since Irvin Bethea was convicted of violating RICO, I must look to Sentencing Guideline that addresses a conviction under RICO.

Chapter 2, Section 2E1.1 provides the relevant guideline for "unlawful conduct re-

lating to Racketeer Influenced and Corrupt Organizations", as follows:

(a) Base Offense Level (Apply the greater):

(1) 19; or

(2) the offense level applicable to the underlying racketeering activity.

Thus, this section requires the court to cross reference the guideline range for other underlying offenses. Section 1B1.3 addresses guidelines that involve cross-references. It specifically provides that cross-references in Chapter Two shall be determined on the basis of:

(1) all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense.

This language states that in computing the base offense level when a defendant is convicted of violating RICO, the Court should not distinguish between underlying offenses for which the defendant was convicted and underlying offenses for which the defendant was not convicted. Rather, the language reads that in his or her role as factfinder at the sentencing, the judge may compute the sentence based on any underlying offense which the court finds, under the appropriate standard, that the government has proven.

■ A very recent Seventh Circuit case supports this interpretation. In *United States v. Masters*, 978 F.2d 281 (1992), the defendant was convicted of a number of racketeering activities, including soliciting the murder of his wife. The district judge calculated the sentence by using the guideline for murder, even though the jury declined to answer a special interrogatory asking about the murder. In reviewing the district court's findings, the Court of Appeals stated:

Section 2E1(a)(2) ... speaks of the underlying activity and not an underlying conviction.... Section 1B1.3(a)(iii) says that 'cross references in Chapter Two ... shall

be determined on the basis of the following: (1) all acts and omissions committed and aided or abetted by the defendant ... that occurred during the commission of the offense of conviction'. The murder ... occurred during the racketeering conspiracy. So sec.2E1(a)(2), read from the perspective of sec. 1B1.3(a), directs the court to the murder guideline rather than the solicitation guideline. At least it does this if the court's finding that [the defendant] is responsible for [the murder] is sustainable, and the process is otherwise consistent with the Constitution.

*Masters* at 284. The Court held that "real-offense principles influence not only the aggravating and mitigating factors but also the definition of relevant conduct under § 1B1.3".

This court's reading of the RICO guideline is also in conformance with and in furtherance of sentencing practices in both the pre-Guidelines and post-Guidelines days.

Prior to the Guidelines, the court had nearly unfettered discretion to impose a fair and just sentence. See, e.g. *Robert v. United States*, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980); *United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978). While the Sentencing Guidelines constrained some discretion, the method of computation codifies much of the pre-Guidelines policy.

When the Sentencing Reform Act was enacted in 1984, it directed the United States Sentencing Commission to develop guidelines for sentencing by creating categories of offense behavior and offender characteristics. One of the Sentencing Commission's goals in establishing guidelines was to fashion a system that "metes out punishment on the basis of a defendant's actual conduct in a particular case." *United States v. Kikumura*, 918 F.2d 1084, 1098 (3d Cir.1990). Such a system is meant to address the fact that "particular crimes may be committed in different ways", see *id.* at 1098 (quoting Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest, 17 Hofstra L.Rev. 1, 9 (1988)). Specifically, the Guidelines call for the sentencing judge to modify the base offense level through a myriad of

specific offense characteristics and adjustments. As the Sentencing Act states, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person ... for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Only three years ago, the Third Circuit Court of Appeals agreed that both the pre-Guidelines and post-Guidelines policies mandate the judge to take into account crimes of which the defendant has not been convicted but that demonstrate the character of the offense and the offender. Thus, in *United States v. Ryan*, 866 F.2d 604, 609 (3d Cir. 1989), while addressing an upward departure from the guidelines, the Third Circuit stated:

> Before the guidelines were promulgated, a court was permitted to consider evidence on counts of which a defendant was acquitted in sentencing the defendant. [citing cases].... [T]he guidelines, as we read them, indicate that the Commission intended to permit sentencing courts to consider such information in determining whether to depart from the applicable guideline.

See also *United States v. Fonner*, 920 F.2d 1330, 1332–34 (7th Cir.1990) ("Nothing in either the guidelines or the Constitution prevents a judge from taking account of conduct in which the defendant engaged, whether or not an acquittal prevents the imposition of criminal penalties directly on that conduct.").

In *Masters*, Judge Easterbrook stated the justification behind this principle:

> Judges have been considering defendants' activities and character since long before there were guidelines, with consistent approval from the highest court. [citing cases]. This is one reason why we have held that judges may take other crimes into account when selecting a sentence under the guidelines, even if the defendant has been charged with and acquitted of those crimes. An acquittal means that the charge was not proven beyond a reasonable doubt; it does not mean the defendant didn't do it.

I see no reason why this policy should not apply to interpreting the clear language of the RICO guideline.

Therefore, in light of the clear language of the Guidelines, the holding in *Masters*, and the sentencing practices in this as well as other Circuits, I find that the RICO guideline allows a defendant's sentence to be computed based on underlying offenses of which the defendant has not been convicted.

### B. *Is This Relevant Conduct*

■ Mr. Bethea argues that even if the guideline allows the Court to take into account offenses for which the defendant has not been convicted, the murder of Mutah Sessoms is an "entirely different offense" from the crimes for which Bethea has been convicted, and that this "distinction in kind" places the murder outside the realm of "relevant conduct" under Section 1B1.3. I disagree.

The defendant was convicted of engaging in an unlawful racketeering conduct to perpetuate an enterprise. The enterprise was, to put it starkly and simply, a drug gang. While the underlying offenses for which defendant was convicted are clearly and easily characterized as furthering the drug gang, I find that the murder of Mutah Sessoms also was directly related to perpetuating and protecting the enterprise. As explained in my factfindings below, but for the existence of the enterprise, Mr. Sessoms would not have been killed. He was killed to protect the drug enterprise, to help perpetuate the enterprise, and in revenge for his actions against the drug enterprise. Even looking only at the underlying offenses for which Mr. Bethea was convicted, the murder was committed "in the course of attempting to avoid detection or responsibility for that offense, or [was] otherwise [ ] in furtherance of that offense." U.S.S.G. § 1B1.3(a)(1).

Defendant next points to recent cases allegedly requiring a close nexus between the Count upon which a conviction was obtained and the other "relevant conduct" used by the Court in computing the sentence. However, both cases relied upon by defendant involved an interpretation of § 1B1.3(a)(2). The relevant conduct in that section "is applicable only to the kinds of offenses that would be grouped together under § 3D1.2(d), and is designed to take account of a pattern of

misconduct that cannot readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing." *United States v. Mullins*, 971 F.2d 1138, 1143 (4th Cir.1992); see also *United States v. Hahn*, 960 F.2d 903, 910 (9th Cir.1992) ("In assessing whether conduct is relevant within the meaning of Guidelines 1B1.3(a)(2), the sentencing court is to consider such factors as the nature of the defendant's acts, his role, and the number and frequency of repetitions of those acts, in determining whether they indicate a behavior pattern"). Thus, the crimes addressed in the Guideline relied upon in those cases are qualitatively different than RICO. RICO, by its nature, may involve a variety of seemingly distinct offenses which nevertheless are connected in the goal to further the enterprise.

Therefore, I find without hesitation that the murder of Mutah Sessoms was relevant conduct under a RICO conviction.

### C. *The Facts*

Finally, I must determine whether Mr. Bethea murdered Mutah Sessoms. This inquiry requires an initial determination of the appropriate evidentiary standard for finding facts at the sentencing hearing.

 It is settled law that during the sentencing phase, the trial judge acts as factfinder, and the procedural safeguards that apply to a trial do not generally apply. See *Kikumura*, 918 F.2d at 1100. Particularly relevant to this case, the Supreme Court has held that in determining facts at the sentencing phase, the sentencing court generally may use a "preponderance of the evidence" standard rather than a "beyond a reasonable doubt" standard. *McMillan v. Pennsylvania*, 477 U.S. 79, 88, 106 S.Ct. 2411, 2417, 91 L.Ed.2d 67 (1986) In *United States v. Kikumura*, 918 F.2d 1084 (1990), the Third Circuit addressed *McMillan* while reviewing a trial court's upward departure of a defendant's sentence from 30 months to 30 years. While the Court of Appeals warned that such departures may create a sentencing hearing that functions as "a tail which wags the dog of the substantive offense," *id.* 918 F.2d at 1101 (quoting *McMillan* 477 U.S. at 88, 106 S.Ct. at 2417), the Court ultimately upheld

the district court's use of its discretion. Specifically, Judge Becker interpreted *McMillan* to hold that while a preponderance standard is generally constitutional, "a different question would be presented if the magnitude of a contemplated departure is sufficiently great that the sentencing hearing can fairly be characterized as a tail which wags the dog of the substantive offense." *Kikumura* 918 F.2d at 1101. Therefore, the Court held that "in such situations, the factfinding underlying that departure must be established at least by clear and convincing evidence." The Supreme has stated that facts are proven by clear and convincing evidence if they produce in the mind of the trier of fact "an abiding conviction that the truth of the factual contentions are highly probable." *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 2437, 81 L.Ed.2d 247 (1984).

I believe that the reasoning in *Kikumura* applies equally to the use of offenses for which the defendant was not convicted in imposing a sentence under the RICO guideline. Factfinding pursuant to the RICO Guideline contemplates a judge using his discretion to impose a sentence harsher than one based solely on the crimes for which the defendant was convicted. Moreover, in this case, the government's motion, if granted, would increase the defendant's offense level from 39 to 43. The difference between the exposures, though numerically small, is qualitatively great. If Mr. Bethea is sentenced under an offense level of 39, he may see the light of day again. If he is sentenced under an offense level of 43, he will not.

Therefore I will use a clear and convincing evidence standard to determine whether Mr. Bethea murdered Mutah Sessoms.

I turn to that issue now.

At the conclusion of the Closing Arguments in the Bethea case, I read the following instruction to the jury:

To prove Racketeering Act One against either defendant, the government must prove the following three elements beyond a reasonable doubt:

**FIRST:** That Mutah Sessoms was killed.

**SECOND:** That the defendant killed or acted as an accomplice to others who killed Mutah Sessoms.[1]

**THIRD:** That the defendant acted knowingly and purposely with the specific intent to unlawfully cause Mutah Sessoms' death.[2]

The following constitutes my findings by clear and convincing evidence.

In November of 1988, Mutah Sessoms began cooperating with the Elizabeth Police Department in its investigation of drug trafficking in the city of Elizabeth. In the course of his contacts, he gave the police a thirty-seven page statement. In that statement, he described the drug organization of Bilal Pretlow and identified Irvin Bethea as one individual working for the gang. When Pretlow gang members were arrested and arraigned in state court, they were provided through discovery disclosure a copy of Sessoms' statement.

On June 16, 1989, Corey Grant picked up Sessoms at his girlfriend's house, in a light blue Ford car. The two went to an apartment at 117 Hollywood Avenue in East Orange, New Jersey. Arriving at the apartment at the same time were Irvin Bethea, and Robert and Bilal Pretlow. Charles Jackson, and Derrick and Marvin Freeman were already there when the others arrived. Bethea was carrying an M–16 machine gun when he arrived; Bilal Pretlow carried an Uzi semi-automatic machine gun, and Robert Pretlow had a .32 or .38 caliber handgun.

The gang began the murder by confronting Sessoms about his cooperation with the police. As Robert Pretlow told Sessoms that he "shouldn't have ratted" to the police, and as Bilal Pretlow told Sessoms that he thought he should kill him, Irvin Bethea pointed his gun at Sessoms. Although Sessoms agreed to leave town forever, Bethea and the others began to grab at Sessoms. Grant put Sessoms into a choke hold, and Bethea and Robert Pretlow got a hammer and began to hit Sessoms on the head. Bethea struck the first blow. Sessoms fell to the ground and begged for his life. While Bethea and others watched, Robert Pretlow chopped at Sessoms' neck with a machete. When noises came from the body, Robert Pretlow stuffed a towel in Sessoms' neck, and Sessoms stopped moving.

Someone then carried Sessoms' body to the bathtub. The Pretlows and Grant

---

1. I defined this offense as follows:

The government may satisfy this element by proving **EITHER:**

1) the defendant's actions directly caused Mutah Sessoms' death; **OR**

2) the defendant acted as an accomplice to those who actually killed Mutah Sessoms.

An accomplice is someone who aids, assists, supports, or attempts to aid, assist, and support another person in the commission of a crime, in this case the alleged murder of Mutah Sessoms. In other words, an accomplice is someone who seeks, by some act or failure to act, to make the criminal venture succeed. Accordingly, while the government need not demonstrate that there was any sort of formal agreement or understanding to commit the crime in question, a defendant's mere association with an individual involved in a criminal act is not sufficient to transform him into an accomplice. Nor does the mere presence of a defendant at the scene of the crime, even in the company of one or more of the principal wrongdoers, turn him into an accomplice. To be an accomplice, the defendant must seek through his actions or inactions to have the crime succeed. Put simply, he must be more than a mere spectator.

2. I defined this element as follows:

**THIRD:** As I previously mentioned, a defendant acts knowingly if his action is voluntary and not the result of a mistake, accident, or other innocent reason. He acts purposely if his conscious objective is to achieve a wrongful end—in this case the death of Mutah Sessoms. Therefore, to satisfy this element, the government must demonstrate beyond a reasonable doubt that the defendant acted voluntarily and with the specific intent to cause the death of Mutah Sessoms.

I remind you that a defendant's state of mind cannot be proven directly because there is no way of looking into the operation of a person's mind. However, you may infer the defendant's state of mind from circumstantial evidence such as the defendant's words, actions, and the surrounding circumstances. In drawing any reasonable inference from the evidence, you should remain careful not to confuse a defendant's state of mind with his motive. Again, motive is a reason which prompts a person to act. State of mind refers to how aware a person was of what he was doing. If the defendant knowingly and purposefully acted with the intent to cause the death of Mutah Sessoms, he is responsible for this action regardless of whether he had a good or bad motive.

brought an electric saw, hammer, machete, buckets, rubber gloves and a box of acid to the apartment and told Bethea and Grant to cut up the body. Bethea and Grant returned soon after, claiming they were having trouble cutting up the body. Robert Pretlow went into the bathroom to finish up the job.

Irvin Bethea was in the hallway kitchen area when Bilal Pretlow carried Sessoms' head into the living-room and placed it in a pail of acid. Bethea and others then began to clean up the apartment, while Bilal Pretlow and Corey Grant left to buy suitcases for the purposes of disposing of the body. When Pretlow and Grant returned, the gang placed Sessoms' body parts inside green plastic garbage bags. They then placed these bags inside the suitcases. Irvin Bethea and others took the suitcases to a car, and Bilal Pretlow and Grant drove away to scatter the remains-carrying suitcases on the streets of Newark.

Despite this evidence elicited at trial by eyewitnesses to the murder, defendant argues that the testimony relied on by the government is contradicted by other testimony. Defendant's arguments are based primarily on his belief that the testimony relied upon in the government's case—the eyewitness accounts of Charles Jackson and Marvin Freeman—was not credible. I address defendant's arguments in turn.

First: Defendant states that two other persons gave detailed statements about the murder, but Jackson and Freeman stated that those persons were not present at the apartment. Therefore, defendant argues, the jury may not have been convinced that Jackson and Freeman were present at the time of the murder. After a thorough review of the record, and based on the stark testimony Jackson and Freeman gave, however, I am unequivocally convinced that Jackson and Freeman were present at the time of the murder and that their testimony is completely credible.

Second: Defendant points out that while Jackson and Freeman testified that only two people went out to buy suitcases for the body parts, officials from Woolworth's testified that three persons were involved in the purchase of the suitcases. I find this argument unpersuasive when considered in light of the entirety of Jackson's and Freeman's account. Even if they were mistaken about the number of people purchasing the suitcases, that dispute does not negate the fact that Mutah Sessoms was killed in the manner described above or that Mr. Bethea intentionally participated in that murder. If anything, defendant's argument supports the eyewitnesses' account of the manner of the murder.

Third: Defendant states that according to government witnesses, Sessoms was last seen alive at approximately 11:00 a.m. at two different locations in Elizabeth. Jackson and Freeman testified, however, that Sessoms had been brought to East Orange by at least 10:00 a.m. At best, though, this only contradicts the exact time of the murder. I do not believe it calls the credibility of the witnesses into question.

Fourth: Defendant points out that despite a medical examiner's testimony that Sessoms had consumed a substantial amount of alcohol prior to his death, none of those who were in Sessoms' company prior to his death mentioned this. It seems clear from the record, though, that the eyewitnesses were preoccupied by other thoughts and other memories. I do not believe that this fact detracts from the persuasiveness of the witnesses' testimony.

Fifth: Defendant argues that despite the graphic description of the death and dismemberment, there was no trace of blood or remains at the location, and none of the neighbors heard any noises. Simple reason, however, supports the view that murderers would not want to leave behind traces of such a grotesque killing. Moreover, the testimony showed that Bethea and others spent hours cleaning up the apartment. Finally, I simply do not believe that the lack of reports of noises defeats the credibility of Jackson and Freeman.

Sixth, defendant contends that the jury may have believed that Sessoms was killed by Jackson, Freeman and Freeman's brother Derrick, who was serving a prison sentence for homicide at the time of trial. Defendant points to what he argues is supporting evidence for this interpretation. After review-

ing the evidence, however, I reject this view as implausible.

Seventh, defendant contends that a finding that Bethea was responsible for the murder is "utter speculation". I completely disagree. The finding involves a determination of credibility, not speculation.

In other words, the evidence clearly and convincingly demonstrates that Irvin Bethea was intimately involved in the intentional murder of Mutah Sessoms: that he actually participated in the killing process by hitting Sessoms over the head with a hammer; that he tried to dismember Sessoms' body; that he helped clean up the apartment; and that he helped carry suitcases containing Sessoms' body parts to the car. It is strikingly clear that Mutah Sessoms was killed, that Irvin Bethea participated in the killing and acted as an accomplice to others who participated in the killing, and that Bethea acted knowingly and purposely with the specific intent to unlawfully cause Sessoms' death. Were I the trier of fact in the case, I would have found *beyond a reasonable doubt* that Mr. Bethea murdered Mutah Sessoms.[3]

Having found that Mr. Bethea committed the underlying act of murdering Mutah Sessoms, the Guideline for RICO compels me to look to the Guideline for murder. That Guideline, § 2A1.1 computes the base offense level to be "43". The sentencing period under a level 43 offense is life imprisonment.[4]

Because this Opinion addresses a relatively new question, it is possible that the Court of Appeals may disagree with my interpretation of the RICO guideline. If, however, it is determined that the RICO provision only permits the court to look to underlying offenses for which the defendant was convicted, then I believe that an upward departure would be appropriate.

I turn to this issue now.

## II. *Upward Departure*

There is ample authority for the trial court to use its *discretion* to depart upward from the guidelines to impose a fair sentence that fits the offender and the offense. This practice comports with the policy of allowing judicial discretion to compute a fair and just sentence. See Judge Edward R. Becker, Flexibility and Discretion Available to the Sentencing Judge Under the Guidelines Regime, in Federal Probation, December 1991.

The Guidelines allow the Court to depart both upward and downward when the nature of the offense and the nature of the offender so require. As the Third Circuit has pointed out, "the guidelines indicate that departure may be warranted on the basis of conduct which is not an element of the offense of conviction." *United States v. Ryan*, 866 F.2d 604, 609 (3d Cir.1989). Specifically, "the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different than that described." *§ 5K2.0.* Moreover, "where ... the applicable offense guideline and adjustments do take into consideration a factor listed in this subpart, departure from the ... range is warranted only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense."

Thus, I must first determine whether the Sentencing Commission has already taken the factual situation into account in computing the applicable guideline range.

The Court may depart upward only when the Guidelines' computation of the sentence does not adequately take into consideration the circumstances of the case. *Kikumura* 918 F.2d at 1104. As noted above, the

---

3. However, pursuant to the Third Circuit's guidance in *Kikumura,* and my interpretation of that decision, my findings were based on the clear and convincing evidence standard.

4. It is true that this finding represents a grave increase over the probation officer's finding

based on the convicted underlying offense. However, finding a level 43 offense level does not *necessarily* mandate the imposition of life imprisonment; rather, the Court is empowered to take all relevant factors into account to determine whether a downward departure is appropriate.

RICO guideline directs the judge to compute the sentence based on "the offense level applicable to the underlying racketeering activity." If the RICO guideline language is read—contrary to my reading—that the court may only look to the offense level applicable to underlying activity of which the defendant *is* convicted, then the language clearly does not take into account the situation in this case. This is true for the following reasons.

■ First, the defendant was convicted of engaging in racketeering in furtherance of an enterprise. While the Guidelines take into account the specific offenses for which the defendant has been convicted, neither the RICO Guideline nor the commentary take into account the general depraved acts a defendant may have committed to further the enterprise generally. That is, the Guideline does not consider the entirety of the defendant's conduct in furtherance of the enterprise and conspiracy. For example, in *Kikumura*, the defendant was convicted of several explosives and passport offenses. The court upwardly departed because it found at the sentencing stage that the firebombs manufactured by the defendant were in preparation for a major terrorist bombing on American soil. The Court of Appeals agreed with the district judge that the Guidelines did not take this peculiar fact into account. Similarly, in this case the defendant was convicted of engaging in unlawful racketeering activity to further an enterprise. And the facts show that as part of the desire to perpetuate and protect the enterprise, a human being was brutally and sadistically murdered and dismembered. As in *Kikumura*, the Guidelines do not take into account the different enterprises defendants may be engaged in and the varieties of conduct done to perpetuate a given enterprise.

Therefore, having found by clear and convincing evidence [5] that Bethea murdered Mutah Sessoms, I have the authority to depart upward from the offense level as computed by the Probation Department.

■ Several factors listed in the Guidelines warrant a departure in this case. First, Section 5K2.1 states that "[i]f death resulted, the court may increase the sentence above the authorized guideline range." Bethea's intentional participation in the murder of Sessoms, a crime that was done in furtherance of the offense upon which Bethea was convicted, warrants departure under this section.

Second, section 5K2.2 states that "[i]f significant physical injury resulted, the court may increase the sentence above the authorized guideline range." In this case, before Mutah Sessoms was finally killed, he was sadistically tortured by Bethea and others. Bethea's intentional infliction of torture upon Sessoms in furtherance of the enterprise warrants departure under this section.

Finally, Section 5K2.8 authorizes a departure when "the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim." Examples include "torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation." It is difficult to imagine a more appropriate case for application of this section. The murder of Mutah Sessoms was brutal, degrading, sadistic, and gratuitous.

Therefore, having considered the entire record in the case, the comprehensive and thorough report of the Probation Department, the parties' presentations to the court, and the facts as I have found them by clear and convincing evidence, I believe that the sentence of Irvin Bethea warrants an upward departure. In light of the depraved, heinous, and sadistic nature of the murder, as well as Mr. Bethea's lack of remorse or acceptance of responsibility for the killing, I believe that an upward departure of the highest magnitude is warranted. Thus, I will depart upward from a level 39 offense level to a level 43 offense level.

## CONCLUSION

For the reasons detailed above, I find that the RICO sentencing guideline allows the

---

5. As noted in the discussion of *Kikumura* above, in finding facts relevant to an upward departure of this magnitude, the court must use a clear and convincing standard. Also as discussed above, I found not only by clear and convincing evidence, but also beyond a reasonable doubt, that Mr. Bethea committed the murder of Mutah Sessoms.

court to take into account underlying offenses for which a defendant was charged but not convicted. Because I find by clear and convincing evidence that Irvin Bethea murdered Mutah Sessoms, I compute his offense level to be 43.

In case the Court of Appeals disagrees with my interpretation of the Guidelines, I find alternatively and secondarily that because of Irvin Bethea's murder of Mutah Sessoms, his sentence warrants an upward departure of the highest magnitude, and I will increase his offense level from 39 to 43.