In the

# United States Court of Appeals
### For the Seventh Circuit

No. 02-3006

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DANIEL P. BOOS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 01-CR-109-C—**Barbara B. Crabb**, *Chief Judge.*

ARGUED APRIL 1, 2003—DECIDED MAY 15, 2003

Before FLAUM, *Chief Judge*, and COFFEY and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.*  On a November day in 1990, a backhoe operator at a landfill in Minnesota was shocked when he saw a severed arm fall out of a plastic bag lodged in a pile of garbage he was trying to move. The arm carried a distinctive tattoo of a bare-chested woman riding astride a tiger. The tattoo helped police establish that the arm belonged to Robert Melby, a member of the Iron Wings motorcycle "club," a gang with headquarters in an old farmhouse in rural Dunn County in northwest Wisconsin. Melby had been "missing" for some 6 months when his arm was found.

Melby's murder eventually became the tail that wagged the dog in this prosecution a dozen years later of Daniel Boos, the former president of the Iron Wings. Boos pled guilty in 2002 to using the Iron Wings' "clubhouse" to sell drugs—cocaine and methamphetamine—and being a felon in possession of firearms. 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 922(g)(1). That set the stage for what turned out to be the real battleground of the case, the government's claim that Boos' sentence should be significantly enhanced because he murdered Melby. After a 2-day hearing, the district judge was convinced that Boos had done the deed, so she invoked the guidelines' murder cross-reference, U.S.S.G. § 2D1.1(d)(1), which considerably jacked up Boos' penalty range. Instead of a sentence within a range of 121 to 151 months, Boos received a sentence of 30 years (240 months on one count and 120 on the other, to run consecutively). This enhancement forms the primary basis of Boos' appeal.

Boos argues that requiring proof of the murder only by a preponderance of the evidence violated his due process rights because the application of the murder cross-reference hiked up his sentence so severely.

First, relying on *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000), Boos claims that applying the cross-reference essentially adds an element of the crime, and, as such, the murder must be proved to a jury's satisfaction beyond a reasonable doubt. But *Apprendi* only applies to sentencing increases beyond the statutory maximum for the underlying offense. Since Boos' 30-year sentence was equal to the combined statutory maximum for the two counts of his conviction, *Apprendi* does not apply. *See United States v. Noble*, 299 F.3d 907, 909-10 (7th Cir. 2002) ("Noble's 30-year combined sentence does not exceed the combined maximum for the two counts, so there was no *Apprendi* violation.").

Boos also argues that, at a minimum, the district court should have required the government to show clear and convincing evidence that he killed Melby. Although Boos admits that the preponderance of the evidence standard is generally applied when deciding what effect to give relevant uncharged conduct at sentencing (and, in fact, an enhancement can be proper for uncharged conduct even if the defendant previously had been acquitted on charges for that conduct), *see United States v. Watts*, 519 U.S. 148, 156-57 (1997), he claims his situation warrants an exception because his sentence increased so dramatically. Other circuits have applied a clear and convincing standard in similar situations. *See United States v. Kikumura*, 918 F.2d 1084, 1101 (3rd Cir. 1990); *United States v. Shonubi*, 103 F.3d 1085, 1089 (2nd Cir. 1997).

At times, we have suggested that a higher standard might be necessary in the rare instance when a factual finding will result in a sentencing increase so great "that the sentencing hearing can fairly be characterized as 'a tail which wags the dog of the substantive offense.'" *United States v. Corbin*, 998 F.2d 1377, 1387 (7th Cir. 1993) (quoting *United States v. Schuster*, 948 F.2d 313, 315 (7th Cir. 1991) (citations omitted)). *See also United States v. Smith*, 308 F.3d 726, 748 (7th Cir. 2002) ("[T]he principle . . . remains viable."); *United States v. Rodriguez*, 67 F.3d 1312, 1322 (7th Cir. 1995) ("Our decisions implicitly have agreed with *Kikumura* to the extent that due process considerations may, at some point, require a greater showing for a dramatic increase."); *Schuster*, 948 F.2d at 315-16 (finding that the difference between a sentence in the 21-to-27-month range and a 5-year sentence was not so "exceptional" as to require a higher burden of proof, but implying that an "exceptional" situation would warrant a higher burden of proof).

Despite suggestions in some of our cases, we have never taken the final step and actually required the prosecution

to meet a clear and convincing evidence standard. In fact, we have at times been critical of *Kikumura's* basic premise. *See United States v. Ewers*, 54 F.3d 419, 421 (7th Cir. 1995) (we have "not been sympathetic to the *Kikumura* analysis"); *United States v. Masters*, 978 F.2d 281 (7th Cir. 1992). In *Masters*, we found:

> A sentence at the top of the statutory range does not punish Masters for a crime he didn't commit; it uses all available information about his character and dangerousness in choosing the sentence for the crime of which he stands convicted. Judges have been considering defendants' activities and character since long before there were guidelines, with consistent approval from the highest court. This is one reason why we have held that judges may take other crimes into account when selecting a sentence under the guidelines, even if the defendant has been charged with and acquitted of those crimes.

978 F.2d at 285 (citations omitted). As a result, we found that "[a]lthough *Kikumura* expressed [its] conclusion in constitutional terms, it is impossible to square such a holding with McMillan—or with the history of discretionary sentencing in the United States." Therefore, the defendant's due process argument went "nowhere." *Id.* at 286 (citing *McMillan v. Pennsylvania*, 477 U.S. 79 (1986) and noting that the Supreme Court has also held that the preponderance standard is appropriate when deciding whether to use other-crimes evidence at trial, *see Huddleston v. United States*, 485 U.S. 681, 690 (1988)).

Despite our castigation of *Kikumura's* reasoning in *Masters*, we did not reject *Kikumura's* holding. That's because we were able to "defer until another day the decision whether development in a common-law fashion ever would lead to the use of a clear-and-convincing standard in sentencing," 978 F.2d at 287, since the finding

of murder resulted in just a 4-level increase. We do not have that option here, however, as the more than 17 additional years Boos received from the application of the cross-reference (more than doubling his sentence) qualifies as "exceptional." That seems to put *Masters'* anti-*Kikumura* train back on the track, ready to run into our suggestions in *Corbin* and *Schuster* that we should require clear and convincing evidence for drastic sentencing increases.

As we did in *Masters*, though, we can pull the emergency brake and avoid the collision of the two seemingly incongruous lines of cases. That's because the evidence against Boos supports a finding of guilt even under a clear and convincing evidence standard, making the choice of standard irrelevant. *See, e.g.*, *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001) ("[A]n appellate court may affirm the district court's dismissal on any ground supported by the record, even if different from the grounds relied upon by the district court.").

Boos argues that the evidence does not support a finding of guilt even under a preponderance of the evidence standard. Investigators found no blood or bullet fragments in the basement of the Iron Wings clubhouse, where police think the murder took place (although at the time of the search they did not know Melby had been killed, so they were not looking for any signs of the murder).

In addition, there were no bullets found in the leg police recovered (the other leg was never found). Boos claims that contradicts a written description of the killing by Randy Simonsmeier, the prosecution's star witness to whom Boos confessed (Simonsmeier wrote that Boos shot Melby in the "kneecap's," suggesting that both legs should have contained at least one bullet). Also, no fingerprints were discovered on the plastic bags containing Melby's arm and leg, and police found no plastic bags at the Iron Wings clubhouse that were like the ones found containing Melby's arm and leg.

Without more physical evidence, prosecutors might have struggled to prove Boos' guilt beyond a reasonable doubt (likely explaining why Boos was never brought up on state murder charges). But the evidence was sufficient to conclude that it is "highly probable" that Boos killed Melby, thus satisfying both the preponderance of the evidence and clear and convincing evidence standards. *See von Gonten v. Research Sys. Corp.*, 739 F.2d 1264, 1268 (7th Cir. 1984) ("'highly probable' . . . is the Supreme Court's definition of . . . 'clear and convincing evidence'") (citing *Colorado v. New Mexico*, 467 U.S. 310 (1984)).

The best evidence of Boos' guilt came from Simonsmeier, who befriended Boos when the two spent time together in federal prison. Simonsmeier testified that Boos told him in detail how he had killed Melby because he thought Melby, who Boos strongly suspected had been tipping off police to illegal activities by Iron Wings members, had stolen $10,000 and some drugs from him. Boos told Simonsmeier that he lured Melby into the basement of the Iron Wings clubhouse to confront him. When Melby denied stealing the money and drugs, Boos shot him in the knee, and, after Melby again denied the theft, Boos killed him with a shot to the head. With help from his wife, Carrie, and Iron Wings member Roger Waite, Boos cleaned up the mess and cut Melby into pieces, then dropped the body parts in various Minnesota dumpsters.

To support his story, Simonsmeier took the investigating officer to his home and pulled out an undated letter describing the killing, the fear that caused Simonsmeier to keep the story to himself, and the guilt he felt in staying quiet. Waite, who Simonsmeier said "didn't look too happy" when he found Boos telling Simonsmeier about the murder, unwittingly also supported Simonsmeier's story. During a taped conversation containing several thinly veiled references to the murder, Simonsmeier asked Waite "Who else knows?", to which Waite replied, "I ain't got

the slightest. Only thing I know is you do and I've never really liked that."

Simonsmeier's testimony was not the only evidence against Boos. Iron Wings member William Wilson testified that Boos told him he could have Melby's tools because Melby would not be coming back. He also testified that Boos and Waite arranged for the septic system at the Iron Wings clubhouse to be pumped in the summer of 1991, even though it had been pumped the previous year (it has not been pumped since). Wilson's wife testified that Carrie Boos told her that Boos and Waite had killed Melby and disposed of his body. Several other witnesses also told tales consistent with Simonsmeier's story. The district court found all of the witnesses to be credible with the exception of Waite, who testified that he and Boos were not involved in Melby's murder but "lost any chance of appearing to be telling the truth when he said he had never seen defendant deal drugs in the clubhouse." Simonsmeier's testimony and letter, combined with Waite's unintentional corroboration and the testimony of the supporting witnesses, provided clear and convincing evidence that Boos committed the murder.

In addition to his arguments against the application of the murder cross-reference, Boos claims that the district court should not have imposed a 2-level enhancement for obstruction under U.S.S.G. §3C1.1. Boos also thinks he deserved a 3-level reduction under U.S.S.G. §3E1.1 for acceptance of responsibility. To prevail on either claim, Boos must show clear error. *See United States v. Martin*, 287 F.3d 609, 616 (7th Cir. 2002).

The obstruction of justice enhancement stems from Boos' dealings with Iron Wings member Tony Allen, who was arrested along with Abraham and Melissa Savage (Boos' step-son and his wife) on drug charges. Boos suspected Allen of tipping off police to the Savages' activities. When

Allen got out of jail, two of his cars, a truck, a motorcycle, and other valuable items were missing. Boos promised Allen that he would get his property back if it turned out that he had not been giving information to police.

A few months later, Allen was scheduled to testify before the federal grand jury when Boos cornered Allen outside the hearing room and asked him about the proceedings. When police later found Boos sitting in a van outside the building, he claimed he was there to support Melissa Savage (his daughter-in-law), who was also scheduled to appear that day. But the district court found that story "just a little bit too much to ask in the way of my credulity" in part because Boos and Savage were not very close and they made the several-hour drive to the hearing in separate cars.

We agree with the district court's conclusion that Boos' conduct was "certainly . . . intended to intimidate" Allen. Boos told Allen that his property would be returned only if he did not turn out to have given information to police, then showed up when Allen was scheduled to testify in an attempt to hammer that point home. Under those circumstances, we cannot find clear error in the district court's conclusions.

As the district court found, Boos' attempted intimidation of Allen also doomed his chances for a 3-level reduction under U.S.S.G. §3E1.1(b) for acceptance of responsibility. "Conduct resulting in an enhancement under §3C1.1 . . . ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§3C1.1 and 3E1.1 may apply." U.S.S.G. §3E1.1, cmt. n.4. *See also United States v. Keeter*, 130 F.3d 297, 299 (7th Cir. 1997). Boos offers no good reason why this is the sort of "extraordinary case" that would qualify as an exception to the ordinary rule. The district court,

accordingly, did not err when it declined to find that Boos accepted responsibility for his conduct. The judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*