UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1798

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT F. CARROZZA,

Defendant, Appellant.

No. 92-1868

UNITED STATES OF AMERICA,

Appellee,

v.

RAYMOND J. PATRIARCA,

Defendant, Appellant.

No. 92-2213

UNITED STATES OF AMERICA,

Appellant,

v.

RAYMOND J. PATRIARCA,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Boudin, Circuit Judge,

Campbell, Senior Circuit Judge,

and Stahl, Circuit Judge.

Martin G. Weinberg with whom Oteri, Weinberg & Lawson, John F.

Cicilline, Kimberly Homan and Sheketoff & Homan were on briefs for

Raymond J. Patriarca.
James L. Sultan with whom Rankin & Sultan was on brief for

Robert F. Carrozza.
James D. Herbert, Assistant United States Attorney, with whom

A. John Pappalardo, United States Attorney, Jeffrey Auerhahn,

Assistant United States Attorney, and Gregg L. Sullivan, Assistant

United States Attorney, were on briefs for the United States.

September 16, 1993

CAMPBELL, Senior Circuit Judge. Raymond J.

Patriarca pled guilty to one count of conspiring to violate

the Racketeering Influenced and Corrupt Organizations Act

("RICO"), 18 U.S.C. 1962(d), one count of violating RICO,

18 U.S.C. 1962(c), four counts of interstate travel in aid

of racketeering, 18 U.S.C. 1952 (the "Travel Act"), and one

count of conspiring to violate the Travel Act.

He was sentenced by the United States District

Court for the District of Massachusetts to a prison term of

97 months, three years of supervised release, a $50,000 fine,

$122,344 costs of incarceration, and $3,954 costs of

supervision. Pursuant to 18 U.S.C. 3742(b), the government

appeals from the district court's determination that the

relevant conduct for sentencing purposes in this RICO case is

limited to just the predicate Travel Act violations charged

against Patriarca and conduct relating directly to those

charged predicates. Patriarca appeals from the district

court's upward departure under U.S.S.G. 4A1.3 and from the

district court's imposition of the costs of incarceration and

supervision under U.S.S.G. 5E1.2(i).

Robert F. Carrozza appeals from a 228-month

sentence imposed by the district court after Carrozza pleaded

guilty to 49 counts of racketeering-related offenses.

Carrozza argues that the district court's decision to

-3-

"assume" that his base offense level should be adjusted

upwards for his role in the offense constituted plain error.

I. Patriarca's Sentence

A. Background

Count One of the indictment charged Patriarca and

seven codefendants with participation in a criminal

conspiracy to violate the RICO statute. Count Two charged

the same defendants with a substantive violation of the RICO

statute. The remaining 63 counts charged related

racketeering acts involving different defendants, including

in Count 30 a conspiracy to violate the Travel Act.

The RICO charges alleged that the Patriarca Family

had committed illegal activities over a period of 14 years.

They identified the defendants as members of a nationwide

criminal organization known as La Cosa Nostra, and described

Patriarca's role, after July 1984, as the boss and ultimate

supervisor of the Patriarca Family. The RICO counts alleged

that the Patriarca Family, named as the RICO enterprise,

acted in conformity with the rules of La Cosa Nostra,

including the requirement that members commit murder at the

direction of their superiors. It was further alleged that

members of the Patriarca Family were required to obey their

superiors and commit criminal acts at their direction,

including murder. Members of the Patriarca Family were

allegedlyrequiredto
sharetheirillegalprofitswiththeirsuperiors.

-4-

The indictment alleged that the Patriarca Family

was in the business of extortion, narcotics trafficking,

loansharking, gambling, and murder. The indictment charged

the commission of a total of 68 separate, predicate acts,

most of them by defendants other than Patriarca. The

predicate racketeering acts in which Patriarca was personally

named were five violations of (and conspiracy to violate) the

Travel Act, four of which were also charged as substantive

violations against Patriarca in Counts 31, 36, 38 and 39.

Prior to Patriarca's entry of a guilty plea, the

government informed the court and Patriarca that it would

seek to include specific acts of relevant conduct, pursuant

to U.S.S.G. 1B1.3, in determining Patriarca's base offense

level, and would further seek upward departures pursuant to

U.S.S.G. 4A1.3 and 5K2.0. As an example of relevant

conduct, the government then cited Patriarca's involvement in

the narcotics trafficking of Patriarca's associate, Salvatore

Michael Caruana. As an example of conduct justifying an

upward departure, the government cited the murder of Vincent

James Limoli, which was charged against one of Patriarca's

codefendants.

On December 3, 1991, Patriarca pled guilty without

having entered into any agreement with the government. In

the sentencing proceedings that ensued, the government asked

the court to consider seven instances of relevant conduct,

-5-

along with the charged conduct, in determining Patriarca's

base offense level for his RICO offenses. These instances

were (1) Patriarca's involvement in the drug trafficking of

Caruana; (2) Patriarca's efforts to harbor Caruana as a

fugitive; (3) the murder of Limoli; (4) the murder of

Theodore Berns, which was committed by Caruana purportedly

because Berns was involved with Caruana's wife; (5) the

narcotics activities charged against codefendant Robert

Carrozza; (6) Patriarca's alleged authorization of an attempt

to murder Vincent Ferrara; and (7) the harboring of La Cosa

Nostra member, Alphonse Persico, while he was a fugitive from

justice. Of these acts, only the Limoli murder and

Carrozza's drug trafficking had been mentioned in the

indictment, these two acts having been charged as predicate

acts against Patriarca's codefendants (not Patriarca

himself). The government acknowledges that Patriarca had

direct personal involvement only in the Caruana drug

trafficking and the harboring of Caruana as a fugitive. But

it also argues that all seven activities were reasonably

foreseeable to Patriarca and were committed during, and in

furtherance of, the RICO conspiracy after Patriarca had

joined it as its chief.

The government asserted that holding Patriarca

responsible for the Limoli or the Berns murder would increase

his base offense level to 43, but that this level should then

-6-

be reduced by three levels because Patriarca's role was

minimal or minor under U.S.S.G. 3B1.2. The guideline range

for an offense level of 40 and Criminal History Category I is

292-365 months in prison. The government recommended a

sentence of 292 months.

After numerous evidentiary hearings, the district

court announced its decision to sentence Patriarca to 97

months imprisonment. This was an upward departure from the

court's calculated guideline range of 63 to 78 months.1 The

court concluded that relevant conduct in a RICO case was, as

a matter of law, limited to the specific predicate acts

charged against the defendant (here, as to Patriarca, the

Travel Act violations) and conduct relating to the charged

predicates. The court observed that the base offense level

for RICO is the greater of 19 or "the offense level

applicable to the underlying racketeering activity."

U.S.S.G. 2E1.1(a). Because 2E1.1 specifies more than one

base offense level, the court determined that 1B1.3

requires the proper base offense to be ascertained by the

inclusion of relevant conduct. The core question, in the

court's view, was whether "underlying racketeering activity"

within the meaning of 2E1.1(a)(2) referred only to the

predicate racketeering acts charged against Patriarca

1. The district court's extensive sentencing memorandum is
published at 807 F. Supp. 165 (D. Mass. 1992).

-7-

himself, or whether it also embraced other racketeering acts

including those of Patriarca's RICO coconspirators committed

in the course of the RICO conspiracy.

In opting for the former construction, the court

relied upon three principles it felt were key: (1) the

guidelines are primarily a "charge offense" system; (2) the

guidelines are generally intended to duplicate nationwide

past practices; and (3) the guidelines are intended to

establish a sentencing system which is both administratively

workable and fair. Regarding the first, the court noted that

none of the seven instances of conduct cited by the

government had been charged against Patriarca personally in

the indictment. As to the second reason, the court noted

that there are no reported pre-guideline RICO cases in which

a defendant was sentenced and punished for an uncharged

murder. With respect to the third, the court stated that the

government's position was administratively unwieldy: weeks or

months of evidentiary hearings could be required to decide if

a defendant committed the uncharged relevant conduct.

Finally, the court was concerned about the procedural

fairness of punishing a defendant for an uncharged murder

without indictment, trial by jury, and proof beyond a

reasonable doubt.

The court reasoned that adoption of the

government's position would raise serious constitutional

-8-

questions which the district court's interpretation would

avoid. Treating the Limoli or Berns murder as relevant

conduct would, the court believed, have the effect of raising

the maximum penalty for the RICO violations from 20 years to

life imprisonment. The RICO penalty provision, 18 U.S.C.

1963(a), provides for a maximum sentence of 20 years unless

"the RICO violation is based on racketeering activity for

which the maximum penalty includes life imprisonment," in

which case the maximum sentence is life. The guideline

penalty for murder, which is a level 43 offense, is life

imprisonment. Because the district court, unlike the

government, thought a three-level reduction for a minor or

minimal role in the offense was unlikely, the court reasoned

that if Patriarca was held responsible for the Limoli or

Berns murders, his probable sentence would be life

imprisonment. In the court's view, therefore, treating the

murders as relevant conduct (thereby increasing the guideline

range from 63-78 months to life) would violate the due

process clause of the constitution by permitting the relevant

conduct determination "to be a tail which wags the dog of the

substantive offense." McMillan v. Pennsylvania, 477 U.S. 79,

88 (1986).

The government appeals from this determination.

B. The Government's Appeal: Relevant Conduct

-9-

"The legal determination as to the proper interplay

among related guidelines is subject to plenary review."

United States v. Schultz, 970 F.2d 960, 962 (1st Cir. 1992),

cert. denied, 113 S. Ct. 1020 (1993). Therefore, we review

de novo the district court's application of the relevant

conduct guideline, U.S.S.G. 1B1.3, to the RICO guideline,

U.S.S.G. 2E1.1. We conclude that the district court erred

when it limited relevant conduct to conduct in furtherance of

the predicate acts charged against Patriarca. We hold that

relevant conduct in a RICO case includes all conduct

reasonably foreseeable to the particular defendant in

furtherance of the RICO enterprise to which he belongs.

We agree with the government that the language of

the relevant conduct section, 1B1.32, and its application

2. The relevant conduct guideline, in pertinent part,
provides the following:

Unless otherwise specified, (i) the base offense
level where the guideline specifies more than one
base offense level, (ii) specific offense
characteristics and (iii) cross references in
Chapter Two, and (iv) adjustments in Chapter Three,
shall be determined on the basis of the following:

(1)(A) all acts and omissions committed, aided,
abetted, counseled, commanded, induced,
procured, or willfully caused by the
defendant; and

(B) in the case of a jointly undertaken
criminal activity (a criminal plan,
scheme, endeavor, or enterprise
undertaken by the defendant in concert
with others, whether or not charged as a
conspiracy), all reasonably foreseeable

-10-

to the RICO guideline, 2E1.1, are clear, and hence must be

applied. Section 1B1.3 calls for determining the following

guideline elements on the basis of relevant conduct as

defined: (1) the base offense level, where the guideline

specifies more than one base offense level, (2) specific

offense characteristics, (3) cross references in Chapter Two,

and (4) adjustments in Chapter 3. The RICO guideline,

2E1.13, specifies more than one base offense level,

acts and omissions of others in
furtherance of the jointly undertaken
criminal activity,

that occurred during the commission of the
offense of conviction, in preparation for that
offense, or in the course of attempting to
avoid detection or responsibility for that
offense . . . .

U.S.S.G. 1B1.3(a)(1).

The relevant conduct guideline quoted here is the
amended version of 1B1.3, which became effective on
November 1, 1992, after Patriarca was sentenced. Because the
1992 amendments to 1B1.3 only clarify the previous version
of the guideline, we may refer to the later version. See

1B1.11(b)(2) ("the court shall consider subsequent
amendments, to the extent that such amendments are clarifying
rather than substantive changes").

3. The RICO guideline provides the following:

2E1.1. Unlawful Conduct Relating to Racketeer

Influenced and Corrupt Organizations

(a) Base Offense Level (Apply the greater):

(1) 19; or
19

(2) the offense level applicable to the
underlying racketeering activity.

-11-

including a cross reference to "the offense level applicable

to the underlying racketeering activity." See United States

v. Masters, 978 F.2d 281, 284 (7th Cir. 1992) (reference to

"underlying racketeering activity" in 2E1.1(a)(2) is a

cross reference), cert. denied, 113 S. Ct. 2333 (1993);

U.S.S.G. 1B1.5, application note 1 (cross references may be

general, such as "to the guideline for the 'underlying

offense'"). Therefore, 1B1.3 requires the base offense

level for 2E1.1 to be determined on the basis of relevant

conduct as that term is described in 1B1.3(a)(1).

Section 1B1.3 states that "in the case of a jointly

undertaken criminal activity," relevant conduct includes "all

reasonably foreseeable acts and omissions of others in

furtherance of the jointly undertaken criminal activity."

U.S.S.G. 1B1.3(a)(1)(B). This is often referred to as the

accomplice attribution element of relevant conduct. "Jointly

undertaken criminal activity" is defined in 1B1.3(a)(1)(B)

as "a criminal plan, scheme, endeavor, or enterprise

undertaken by the defendant in concert with others, whether

or not charged as a conspiracy." Id. (emphasis added).

Here, the RICO enterprise the Patriarca Family was a

"jointly undertaken criminal activity." Thus, Patriarca is

potentially liable for the foreseeable criminal acts of

U.S.S.G. 2E1.1.

-12-

others in furtherance of that enterprise even though he did

not personally participate in them.

The application notes expand on the role of

relevant conduct in the case of criminal activity undertaken

in concert with others. We quote from application note 2 to

1B1.3 at length because of the guidance it provides to

courts in determining when a defendant is responsible for the

conduct of others under the accomplice attribution element of

the relevant conduct guideline:

In the case of a jointly undertaken criminal activity,
subsection (a)(1)(B) provides that a defendant is
accountable for the conduct (acts and omissions) of
others that was both:

(i) in furtherance of the jointly undertaken
criminal activity; and
(ii) reasonably foreseeable in connection with that
criminal activity.

Because a count may be worded broadly and include
the conduct of many participants over a period of
time, the scope of the criminal activity jointly
undertaken by the defendant (the "jointly
undertaken criminal activity") is not necessarily
the same as the scope of the entire conspiracy, and
hence relevant conduct is not necessarily the same
for every participant. In order to determine the
defendant's accountability for the conduct of
others under subsection (a)(1)(B), the court must
first determine the scope of the criminal activity
the particular defendant agreed to jointly
undertake (i.e., the scope of the specific conduct

and objectives embraced by the defendant's
agreement). The conduct of others that was both in
furtherance of, and reasonably foreseeable in
connection with, the criminal activity jointly
undertaken by the defendant is relevant conduct
under this provision. The conduct of others that
was not in furtherance of the criminal activity
jointly undertaken by the defendant, or was not
reasonably foreseeable in connection with that

-13-

criminal activity, is not relevant conduct under
this provision.

In determining the scope of the criminal activity
that the particular defendant agreed to jointly
undertake (i.e., the scope of the specific conduct

and objectives embraced by the defendant's
agreement), the court may consider any explicit
agreement or implicit agreement fairly inferred
from the conduct of the defendant and others.

Note that the criminal activity that the defendant
agreed to jointly undertake, and the reasonably
foreseeable conduct of others in furtherance of
that criminal activity, are not necessarily
identical. For example, two defendants agree to
commit a robbery and, during the course of that
robbery, the first defendant assaults and injures a
victim. The second defendant is accountable for
the assault and injury to the victim (even if the
second defendant had not agreed to the assault and
had cautioned the first defendant to be careful not
to hurt anyone) because the assaultive conduct was
in furtherance of the jointly undertaken criminal
activity (the robbery) and was reasonably
foreseeable in connection with that criminal
activity (given the nature of the offense).

U.S.S.G. 1B1.3, application note 2.

Application note 2 reflects recognition that the

accomplice attribution provision of 1B1.3 operates to hold

a defendant responsible for the conduct of others even though

"a count may be worded broadly and include the conduct of

many participants over a period of time." So as to keep the

criminal responsibility within bounds, 1B1.3 requires

sentencing courts to ascertain on an individual basis the

scope of the criminal activity that the particular defendant

agreed jointly to undertake. U.S.S.G. 1B1.3, application

note 2. To do this, the court may consider any "explicit

-14-

agreement or implicit agreement fairly inferred from the

conduct of the defendant and others." Id.; see United

States v. Innamorati, No. 91-1896, slip op. at 66 (1st Cir.

June 17, 1993) (members of drug distribution conspiracy may

be held accountable at sentencing for different quantities of

narcotics, "depending on the circumstances of each

defendant's involvement"); United States v. Collado, 975 F.2d

985, 992 (3d Cir. 1992) ("the crucial factor in accomplice

attribution is the extent of the defendant's involvement in

the conspiracy"); Wilkens & Steer, Relevant Conduct: The

Cornerstone of the Federal Sentencing Guidelines, 41 S.C.L.

Rev. 495, 511 (1990) ("liability might be justified for those

who are at the top directing and controlling the entire

operation") (quoting 2 W. LaFave & A. Scott, Substantive

Criminal Law 6.8, at 155 (1986)).

On remand here, therefore, the district court must

determine (1) the scope of the joint criminal activity

explicitly or implicitly agreed to by Patriarca jointly with

others; (2) whether the criminal acts proffered as relevant

conduct were in furtherance of this jointly undertaken

criminal activity; and (3) whether the proffered acts were

reasonably foreseeable in connection with that criminal

activity. These determinations will fix the relevant conduct

under 1B1.3 for purposes of calculating the offense level

under 2E1.1. Such determinations are, of course, all

-15-

inherently fact-bound. See, e.g., Innamorati, slip op. at

66.

Rather than applying 1B1.3 to 2E1.1 in the

straightforward manner discussed above, the district court

limited relevant conduct to only those predicate acts that

were charged against Patriarca personally namely, the

Travel Act violations. In doing so, the district court

improperly treated the term "underlying racketeering

activity" in 2E1.1(a)(2) as if it "otherwise specified"

that relevant conduct should not apply to each "offense of

conviction" (including the RICO conspiracy count and the

substantive RICO count) and instead should apply only to the

predicate Travel Act violations. See U.S.S.G. 1B1.3(a)

("Unless otherwise specified, . . . cross references . . .

shall be determined on the basis of . . . all reasonably

foreseeable acts . . . that occurred during the commission of

the offense of conviction . . . ") (emphasis added). This

was error. "Subsection (a) [of 1B1.3] establishes a rule

of construction by specifying, in the absence of more

explicit instructions in the context of a specific guideline,

the range of conduct that is relevant to determining the

applicable offense level . . . ." U.S.S.G. 1B1.3,

Background. The background commentary to 1B1.3 further

makes clear that "[c]onduct that is not formally charged or

is not an element of the offense of conviction may enter into

-16-

the determination of the applicable guideline range."

Section 2E1.1 specifically the term "underlying

racketeering activity" contains no explicit instructions

displacing the general rule in 1B1.3 that relevant conduct

includes uncharged conduct. In a RICO case, there is no

justification for limiting "underlying racketeering activity"

just to predicate acts specifically charged against one

defendant.4

We, therefore, agree with the government that the

term "underlying racketeering activity" in 2E1.1(a)(2)

means simply any act, whether or not charged against

defendant personally, that qualifies as a RICO predicate act

under 18 U.S.C. 1961(1)5 and is otherwise relevant conduct

4. Aside from its departure from the relevant conduct
guideline, the district court's interpretation could raise
other problems. For example, in some circuits the government
need not allege specific predicate acts when it charges a
defendant with RICO conspiracy. See United States v.

Glecier, 923 F.2d 496, 501 (7th Cir.), cert. denied, 112 S.

Ct. 54 (1991); United States v. Phillips, 874 F.2d 123, 127-

28 (3d Cir. 1989). A court sentencing a defendant in such a
case would be put in a difficult position if forced to apply
literally the district court's analysis. Because such cases
do not identify and charge the "underlying racketeering
activity," a court following the district court's approach
might be limited to the base offense level of 19 as specified
in 2E1.1(a)(1), even though the real offense conduct
underlying the conspiracy is considerably more serious than
other level 19 offenses.

5. Section 1961(1) defines "racketeering activity" to
include, inter alia, "any act or threat involving murder,

kidnaping, gambling, arson, robbery, bribery, extortion,
dealing in obscene matter, or dealing in narcotic or other
dangerous drugs, which is chargeable under State law and
punishable by imprisonment for more than one year; . . .

-17-

under 1B1.3. Because the reference to "underlying

racketeering activity" is a cross reference, 1B1.3 comes

into play and defines "the range of conduct that is relevant

. . . ." See U.S.S.G. 1B1.3, Background. It follows that

the acts of relevant conduct proffered by the government, all

of which are racketeering acts that could have been charged

as predicate offenses, come under the heading of "relevant

conduct" for sentencing Patriarca on the RICO counts of

conviction, provided they otherwise meet the accomplice

attribution standards of 1B1.3(a)(1)(B).

To avoid this conclusion, Patriarca cites to

application notes 1 and 5 to U.S.S.G. 1B1.2. He argues

that these application notes show that the term "underlying

racketeering activity" should be limited to the specific

predicate acts charged against him. We think that neither

application note is applicable here.

Application note 1 to U.S.S.G. 1B1.2 states the

following:

This section provides the basic rules for
determining the guidelines applicable to
the offense conduct under Chapter Two
(Offense Conduct). As a general rule,
the court is to use the guideline section
from Chapter Two most applicable to the
offense of conviction. The Statutory
Index (Appendix A) provides a listing to
assist in this determination. When a

[and] any act which is indictable under . . . title 18 . . .
section 1512 (relating to tampering with a witness, victim,
or an informant) . . . ."

-18-

particular statute proscribes only a
single type of criminal conduct, the
offense of conviction and the conduct
proscribed by the statute will coincide,
and there will be only one offense
guideline referenced. When a particular
statute proscribes a variety of conduct
that might constitute the subject of
different offense guidelines, the court
will determine which guideline section
applies based upon the nature of the

offense conduct charged in the count of

which the defendant was convicted.

(Emphasis ours.)

Patriarca relies on the emphasized portion for the

proposition that relevant conduct pertaining to composite

crimes, like RICO, must be limited to conduct charged in the

indictment. It is clear, however, from the full text of the

application note, that the note is meant to guide courts in

the initial selection of the applicable guideline in Chapter

Two, not to limit cross references within a particular

guideline. There is no question here that the applicable

guideline for RICO convictions is 2E1.1. Thus, application

note 1 to 1B1.2 provides no support for Patriarca's

argument.

Application note 5 to 1B1.2 is equally immaterial

to the application of relevant conduct to 2E1.1.

Application note 5 relates specifically to 1B1.2(d), which

states that: "A conviction on a count charging a conspiracy

to commit more than one offense shall be treated as if the

defendant had been convicted on a separate count of

-19-

conspiracy for each offense that the defendant conspired to

commit." Application note 5 in turn provides the following:

Particular care must be taken in applying
subsection (d) because there are cases in which the
verdict or plea does not establish which offense(s)
was the object of the conspiracy. In such cases,
subsection (d) should only be applied with respect
to an object offense alleged in the conspiracy

count if the court, were it sitting as a trier of

fact, would convict the defendant of conspiring to
commit that object offense. Note, however, if the
object offenses specified in the conspiracy count
would be grouped together under 3D1.2(d) (e.g., a

conspiracy to steal three government checks) it is
not necessary to engage in the foregoing analysis,
because 1B1.3(a)(2) governs consideration of the
defendant's conduct.

U.S.S.G. 1B1.2, application note 5 (emphasis added).

In arguing that 1B1.2(d) and application note 5

limit relevant conduct in composite cases, like RICO cases,

to conduct "alleged" in the indictment as predicate acts,

Patriarca notes similar language in the application notes to

2E1.1 and the multiple count rules. Application note 1 to

2E1.1 states that "[w]here there is more than one

underlying offense, treat each underlying offense as if

contained in a separate count of conviction . . . ."

Similarly, the introductory commentary to the multiple count

rules provides that "[s]ome offenses, e.g., racketeering and

conspiracy, may be 'composite' in that they involve a pattern

of conduct or scheme involving multiple underlying offenses.

The rules in this Part are to be used to determine the

offense level for such composite offenses from the offense

-20-

level for the underlying offenses." Application note 8 to

3D1.2 refers specifically back to 1B1.2(d): "A defendant

may be convicted of conspiring to commit several substantive

offenses and also of committing one or more of the

substantive offenses. In such cases, treat the conspiracy

count as if it were several counts, each charging conspiracy

to commit one of the substantive offenses. See 1B1.2(d)

and accompanying commentary." U.S.S.G. 3D1.2, application

note 8 (emphasis added).

On the basis of this commentary, Patriarca contends

that the only way to apply the multiple count section of the

guidelines to a RICO conviction is to use the directions for

the more commonly applied conspiracy, and hence the rule of

1B1.2(d).6 We disagree. First, the definition of "offense"

6. The training staff at the Sentencing Commission
apparently agrees. In the latest issue of the Sentencing
Commission's Most Frequently Asked Questions About the

Sentencing Guidelines, Vol. VI, Dec. 1, 1992, Question 30

asks: "The defendant was convicted of RICO (18 U.S.C.
1962). How is the alternative base offense level at
2E1.1(a)(2) determined?" The answer provides the following:

Application note 1 to 2E1.1 instructs that where
there is more than one underlying offense (i.e.,

predicate act), each underlying offense should be
treated as if contained in a separate count of
conviction for the purposes of subsection (a)(2).
(See 1B1.2(d) and Application Note 5.) Each of

the underlying offenses, whether or not charged in
substantive counts of conviction, are treated as if
they were substantive counts of conviction, or
"pseudo counts."

Id. The training staff's informational booklet states that

"[t]he information does not necessarily represent the

-21-

contained in the application notes to U.S.S.G. 1B1.1 is not

limited to charged offenses. Instead, "offense" is defined

to mean "the offense of conviction and all relevant conduct

under 1B1.3 (Relevant Conduct) unless a different meaning

is specified or is otherwise clear from the context."

U.S.S.G. 1B1.1, application note 1(l) (emphasis added). As

stated previously, 2E1.1 does not specify a different

meaning; therefore, there is no reason to interpret

"underlying offense" to exclude uncharged conduct.

Furthermore, although applying 1B1.2(d) to RICO

convictions has some superficial appeal, there would be

insurmountable obstacles to its practical application.

First, by its own terms, 1B1.2(d) is limited to counts

"charging a conspiracy." Therefore, it is difficult to see

how 1B1.2(d) could apply to a substantive RICO violation

(as opposed to a RICO conspiracy). Even overlooking this

language, it would be impossible under application note 5 for

a court to determine whether it "would convict the defendant

of conspiring to commit" an underlying offense in situations

where the defendant is charged with a substantive RICO

violation and the underlying offense is not a conspiracy.

official position of the Commission, should not be considered
definitive, and is not binding upon the Commission, the
court, or the parties in any case." Because 1B1.2(d), by
its own terms, is not applicable to RICO convictions, we do
not follow the training staff's suggestion.

-22-

Thus, 1B1.2(d) is inapplicable to nonconspiracy offenses

such as a substantive RICO violation.

There are problems with applying 1B1.2(d) to RICO

conspiracies as well. It seems clear from the plain text of

1B1.2(d), the application notes, and the official

commentary7 that 1B1.2(d) was enacted to deal with

multiple object conspiracies charged in a single count. A

RICO conspiracy, however, is considered a single object

7. Official comments made by the Sentencing Commission at
the time that it enacted 1B1.2(d) clarify the purpose of
Application note 5:

[Application note 5] is provided to address cases
in which the jury's verdict does not specify how
many or which offenses were the object of the
conspiracy of which the defendant was convicted.
Compare U.S. v. Johnson, 713 F.2d 633, 645-46 (11th

Cir. 1983) (conviction stands if there is
sufficient proof with respect to any one of the
objectives), with U.S. v. Tarnopol, 561 F.2d 466

(3d Cir. 1977) (failure of proof with respect to
any one of the objectives renders the conspiracy
conviction invalid). In order to maintain
consistency with other 1B1.2(a) determinations,
this decision should be governed by a reasonable
doubt standard. A higher standard of proof should
govern the creation of what is, in effect, a new
count of conviction for the purposes of Chapter
Three, Part D (Multiple Counts). Because the
guidelines do not explicitly establish standards of
proof, the proposed new application note calls upon
the court to determine which offense(s) was the
object of the conspiracy as if it were "sitting as
a trier of fact." The foregoing determination is
not required, however, in the case of offenses that
are grouped together under 3D1.2(d) (e.g., fraud

and theft) because 1B1.3(a)(2) governs
consideration of the defendant's conduct.

U.S.S.G. App. C., para. 75, p.29 (Nov. 1, 1989).

-23-

conspiracy with that object being the violation of RICO.

United States v. Ashman, 979 F.2d 469, 485 (7th Cir. 1992)

("The goal of a RICO conspiracy is a violation of RICO.")

(quoting United States v. Neapolitan, 791 F.2d 489, 496 (7th

Cir.), cert. denied, 479 U.S. 940 (1986)), petition for cert.

filed sub nom. Barcal v. United States, 61 U.S.L.W. 3857

(U.S. April 6, 1993) (No. 92-1804). In enacting RICO,

Congress intended that "'a series of agreements that under

pre-RICO law would constitute multiple conspiracies could

under RICO be tried as a single enterprise conspiracy' if the

defendants have agreed to commit a substantive RICO

offense."8 United States v. Riccobene, 709 F.2d 214, 224-25

(3d Cir.) (quoting United States v. Sutherland, 656 F.2d

1181, 1192 (5th Cir. 1981), cert. denied, 455 U.S. 949 (1982)

(internal citation omitted)), cert. denied sub nom.

Ciancaglini v. United States, 464 U.S. 849 (1983).

Application notes 1 and 5 to 1B1.2 are not,

therefore, material to determining whether relevant conduct

8. Rather than merely requiring a defendant to agree to
commit a substantive RICO offense, this circuit follows the
minority rule, which requires that a defendant agreed to
commit, or in fact committed, two or more specified predicate
crimes as part of the defendant's participation in the
affairs of the enterprise in order to convict the defendant
for a RICO conspiracy. United States v. Boylan, 898 F.2d

230, 241 (1st Cir.), cert. denied, 498 U.S. 849 (1990);

United States v. Winter, 663 F.2d 1120, 1136 (1st Cir. 1981),

cert. denied, 460 U.S. 1011 (1983). This minority rule,

however, does not affect the general premise that a RICO
conspiracy is a single object conspiracy.

-24-

must be limited to predicate acts charged against a

defendant. Instead, 1B1.3 determines the range of conduct

that is relevant to cross references such as the term

"underlying racketeering activity" in 2E1.1(a)(2), and the

background commentary to 1B1.3 makes clear that "[c]onduct

that is not formally charged . . . may enter into the

determination of the applicable guideline sentencing range."

Because the application of 1B1.3 to 2E1.1 is

straightforward and unambiguous, the district court erred in

resorting to the general principles underlying the guidelines

and the general rule of construction that "courts should

construe statutes to avoid decision as to their

constitutionality." See, e.g., United States v. Monsanto,

491 U.S. 600, 611 (1989). "[C]ourts should strive to apply

the guidelines as written, giving full force and effect to

the Sentencing Commission's interpretive commentary and

application notes." United States v. Zapata, No. 93-1116,

slip op. at 4 (1st Cir. July 19, 1993); accord Stinson v.

United States, 113 S. Ct. 1913, 1915 (1993); United States v.

Brewster, No. 93-1046, slip op. at 7 (1st Cir. July 28,

1993). Absent specific provision in 2E1.1 that "underlying

racketeering activity" includes only charged predicate acts,

we see no principled basis to read such a limitation into the

provision.

-25-

Even were the application of relevant conduct to

2E1.1 less clear than it is, we would have trouble accepting

the three principles cited by the district court as the

rationale for limiting relevant conduct to the predicate acts

actually charged against a defendant. The district court

felt that "the Sentencing Guidelines are closer to a 'charge

offense' system than a 'real offense' system of punishment."

Patriarca, 807 F. Supp. at 190; U.S.S.G. Ch. 1, Pt. A, 4(a),

p. 5. In the court's view, the reason the government did not

charge the conduct at issue in this appeal as predicate acts

in the indictment is because the government had insufficient

evidence to sustain a conviction for this conduct. 807 F.

Supp. at 191. Because conduct "which the prosecutor can

prove in court" is supposed to "impose[] a natural limit upon

the prosecutor's ability to increase a defendant's sentence,"

U.S.S.G. Ch.1, Pt. A, 4(a), p.5, the court thought that it

would be improper for a sentencing court to increase a

defendant's sentence on the basis of uncharged predicate

acts.

Similar arguments have been rejected by this court

and virtually every other circuit court to have addressed the

issue. See, e.g., United States v. Mocciola, 891 F.2d 13,

16-17 (1st Cir. 1989); United States v. Galloway, 976 F.2d

414, 424 n.6 (8th Cir. 1992) (collecting cases), cert.

denied, 113 S. Ct. 1420 (1993). While the district court is

-26-

correct that "for the most part, the court will determine the

applicable guideline by looking to the charge of which the

offender was convicted," United States v. Blanco, 888 F.2d

907, 910 (1st Cir. 1989), real offense principles enter into

the punishment prescribed in the guidelines through the

relevant conduct guideline, 1B1.3. Breyer, The Federal

Sentencing Guidelines and the Key Compromises Upon Which They

Rest, 17 Hofstra L. Rev. 1, 11-12 (1988). Relevant conduct

increases a defendant's sentence, sometimes very

significantly, despite the fact that it was not charged in an

indictment, e.g., Blanco, 888 F.2d at 910, and even despite

the fact that a jury may have acquitted the defendant for

that precise conduct. E.g., Mocciola, 891 F.2d at 16-17;

United States v. Rumney, 867 F.2d 714, 719 (1st Cir.)

("traditional sentencing factors need not be pleaded and

proved at trial") (quoting United States v. Brewer, 853 F.2d

1319, 1326 (6th Cir.), cert. denied, 488 U.S. 946 (1988)),

cert. denied, 491 U.S. 908 (1989). This is because

sentencing factors, including the applicability of relevant

conduct, need only be proven by a preponderance of the

evidence, not beyond a reasonable doubt. Mocciola, 891 F.2d

at 16-17; Galloway, 976 F.2d at 424 n.6. As noted below, in

pre-guideline cases courts likewise took into account untried

criminal conduct when exercising sentencing discretion. The

fact that the government has not charged and proven beyond a

-27-

reasonable doubt the conduct now asserted as relevant conduct

does not prevent the increase in sentence resulting from the

relevant conduct guideline. We see no special reason to

deviate from this principle when dealing with a RICO

conviction.

Nor are we as convinced as the district court that

sentencing Patriarca on the basis of uncharged relevant

conduct might be so unfair as to raise due process concerns.

The district court assumed that if Patriarca was held

responsible for either the Limoli or Berns murder, Patriarca

would face a potential life sentence under the guidelines and

the RICO penalty provision. We believe that the district

court was mistaken in this assumption. The RICO statute sets

the maximum prison sentence at 20 years unless "the violation

is based on a racketeering activity for which the maximum

penalty includes life imprisonment." 18 U.S.C. 1963(a)

(emphasis added). We agree with the government that the

statutory maximum sentence must be determined by the conduct

alleged within the four corners of the indictment.

Otherwise, a defendant would not know at the time of his

arraignment or change of plea what his maximum possible

sentence would be on the charged offenses. The charged

conduct, if proven beyond a reasonable doubt, constitutes the

"violation" of which a defendant is convicted. Patriarca's

charged conduct included no acts such as would result in a

-28-

life sentence. The predicate acts charged in the indictment

were all violations of the Travel Act, which does not carry a

possible life sentence. Therefore, while for sentencing

purposes within the 20-year maximum Patriarca is liable for

uncharged as well as charged relevant conduct, his maximum

penalty is fixed at twenty years for each of the RICO

counts.9 The relevant conduct determination here affects

only where, within that statutory range, Patriarca should be

sentenced.

We are also unpersuaded by the district court's

concern that sentencing Patriarca on the basis of uncharged

predicate acts would be "inconsistent with the Sentencing

9. At oral argument, Patriarca contended that if the
district court determines that Patriarca's base offense level
on the RICO counts is 43 (i.e., if the court decides that

Patriarca is responsible for a murder and that a minimal role
adjustment would be improper), then the court in applying
U.S.S.G. 5G1.2(d) should impose consecutive sentences,
which could total up to 65 years (20 years for each of the
two RICO counts and 5 years for each of the five Travel Act
counts). See United States v. Masters, 978 F.2d 281, 284

(7th Cir. 1992) (affirming district court sentencing RICO
defendant to consecutive maximum sentences of 20 years on
each count, for a total of 40 years, in order to come as
close as possible to life imprisonment prescribed for level
43 offenses), cert. denied, 113 S. Ct. 2333 (1993). At least

one member of the panel believes that serious constitutional
concerns may arise if the defendant ultimately receives the
equivalent of a life sentence on the ground of his connection
with a murder for which he was never indicted, tried or
convicted by a jury. However, the district court may yet
ultimately sentence Patriarca to considerably less than 65
years. Because the district court has not yet sentenced
Patriarca under the relevant conduct guideline as we
interpret it today, any decision as to the constitutional
implications, if any, of a 65-year sentence would be
premature.

-29-

Commission's intention to set up a system which is not

administratively unwieldy." Patriarca, 807 F. Supp. at 192.

While it is true that considerations of administrative

efficiency as well as procedural fairness prompted the

Commission to require sentencing courts "to determine the

applicable guideline by looking to the charge of which the

offender was convicted," it is also clear that the Commission

intended real offense principles to apply to determine the

applicability of various adjustments, including cross

references. See Blanco, 888 F.2d at 910. The fact that

application of real offense principles may burden a

sentencing court with additional fact finding is no reason to

ignore the Commission's compromise between "real offense" and

"charge offense" sentencing. See id. at 911. Sentencing a

RICO defendant on the basis of uncharged predicate acts may

not, indeed, prove to be impracticable. Drug conspirators

are frequently sentenced on the basis of drug transactions

committed by coconspirators. In both situations, the court

must determine the scope of the criminal activity agreed to

by the defendant, the reasonable foreseeability of the

conduct proffered as relevant conduct, and whether the

relevant conduct was in furtherance of the jointly undertaken

activity. To be sure, the wide range of crimes covered by

RICO may inject new complexities, but, if so, the remedy lies

-30-

with the Sentencing Commission. The courts are not empowered

to rewrite the relevant conduct guideline.10

Finally, the district court's observation that

there are apparently no reported pre-guideline cases in which

a RICO defendant was sentenced on the basis of an uncharged

murder is not dispositive. There could, of course, have been

such cases that went unreported or unappealed. Sentences

were not usually the subject of published opinions prior to

the guidelines. And courts often used material information

from many sources in exercising their discretion to set a

sentence within the permissible, often very wide, statutory

range. See, e.g., Roberts v. United States, 445 U.S. 552,

556 (1980); Williams v. New York, 337 U.S. 241, 250-51

(1949); United States v. Lee, 818 F.2d 1052, 1055 (2d Cir.)

("Any circumstance that aids the sentencing court in deriving

a more complete and true picture regarding the convicted

person's background, history, or behavior is properly

considered. For that reason, . . . , other crimes for which

the defendant was neither tried nor convicted, and crimes

charged that resulted in acquittal may be used by the

10. We recognize that determining uncharged relevant conduct
could sometimes impose tremendous additional burdens on a
court. Relief may be afforded, however, in some instances by
the fact that district courts need not make findings as to
acts proffered as relevant conduct if the findings will not
reflect the offense level. See U.S.S.G. 3D1.4

(instructions on determining the combined offense level).

-31-

sentencing court in determining sentence") (citation

omitted), cert. denied, 484 U.S. 956 (1987).

We conclude that the principles put forward by the

district court provide no adequate reason for limiting

relevant conduct to charged predicate acts in RICO cases.

Because the district court incorrectly interpreted the

guidelines, it did not reach a host of other arguments raised

by Patriarca in an attempt to avoid the straightforward

application of the relevant conduct guideline, 1B1.3, to

2E1.1. These arguments include: whether due process and the

Confrontation Clause require additional procedures, such as a

higher standard of proof than preponderance of the evidence,

in order to hold Patriarca responsible for the proffered

relevant conduct; whether due process requires notice of

proffered relevant conduct not otherwise disclosed in the

indictment prior to the entry of a defendant's plea of

guilty; whether sentencing Patriarca for murders that

occurred prior to the effective date of the guidelines

violates the Ex Post Facto Clause, even though the RICO

offense extended beyond that date; whether the relevant

conduct guideline exceeds the Sentencing Commission's

statutory authority; and whether the government should be

estopped from arguing that Patriarca is responsible for the

proffered relevant conduct. Several of these arguments have

been expressly rejected by this circuit and others. See,

-32-

e.g., United States v. Brewster, No. 93-1046, slip op. at 5

(1st Cir. July 28, 1993) ("Absent bad faith . . . the

critical time for disclosure of sentence-related information

is not prior to the taking of a plea, but prior to

sentencing."); United States v. David, 940 F.2d 722, 739 (1st

Cir. 1991) ("It is well established that the guidelines apply

to a defendant whose offense begins before the guidelines'

effective date and continues after the effective date."),

cert. denied, 112 S. Ct. 2301 (1992); Galloway, 976 F.2d at

421-22 (rejecting argument that relevant conduct provision is

not authorized by the Sentencing Reform Act). However, it is

not necessary for us to decide these issues in the first

instance. On remand, the district court should consider, and

where appropriate, decide those issues that Patriarca chooses

to assert again.

In a last ditch effort to avoid resentencing,

Patriarca contends that the legal issue of how relevant

conduct is applied to the RICO guideline has been effectively

mooted by the district court's findings concerning the

proffered acts of relevant conduct. Patriarca asserts that

the in the course of determining whether an upward departure

was warranted pursuant to 5K2.0 and 4A1.3, the court

found, as a matter of fact, that the government had not

established his criminal liability for five of the seven

relevant conduct allegations the Limoli and Berns

-33-

homicides, the Carrozza drug dealing, the Ferrara "hit," or

the harboring of Alphonse Persico.11

This contention has no merit. The district court

expressly stated that because it found that relevant conduct

must be limited to charged predicate acts, it was not

deciding "whether the crimes at issue with regard to relevant

conduct were within the scope of the defendant's conspiracy

and/or reasonably foreseeable consequences of it."

Patriarca, 807 F. Supp. at 196. In discussing the purported

conduct in its upward departure analysis, the district court

merely stated that it was not persuaded that Patriarca knew

of, or personally participated in, these offenses. However,

a defendant can be accountable for the acts of his

coconspirators under 1B1.3 without having been personally

involved. The standard is whether the acts of coconspirators

were in furtherance of the jointly undertaken activity and

were reasonably foreseeable to the defendant. The seven acts

11. As to the remaining two proffered acts of relevant
conduct Caruana's marijuana importation and fugitive
status , Patriarca contends that the court's finding that
such conduct warranted a criminal history upward departure
and the fact that the indictment mentions drug trafficking in
general, rather than particularly alleging marijuana
importation, preclude consideration of this conduct as
relevant conduct. Neither contention has merit. The court
treated the Caruana allegations under the upward departure
guideline, 4A1.3, only because the court thought this
uncharged conduct could not qualify as relevant conduct under
1B1.3. Moreover, we think the indictment's generic
allegation of narcotics trafficking is sufficient to permit
the court to consider marijuana importation as relevant
conduct.

-34-

proffered as relevant conduct must be reexamined in light of

this standard.

C. Patriarca's Appeal

Patriarca appeals from the district court's upward

departure under U.S.S.G. 4A1.3 and from the district

court's imposition of the costs of incarceration and

supervision under U.S.S.G. 5E1.2(i). Our holding that the

district court must resentence Patriarca on the basis of his

relevant conduct moots the issue of the propriety of the

court's upward departure. The district court departed

upwards under 4A1.3 on the basis of its finding that the

government had proved by a preponderance of the evidence that

Patriarca had "aided and abetted drug crimes committed by

Salvatore Michael Caruana" from 1981 to 1983. Patriarca, 807

F. Supp. at 170. Because on remand the court will decide if

the Caruana conspiracy is relevant conduct for RICO

sentencing purposes, its utilization as a basis for upward

departure need not be considered here, and is vacated.

For similar reasons, we must reject Patriarca's

challenge to his cost-of-imprisonment fine. As part of his

sentence, the district court ordered Patriarca to pay a fine

of $50,000 pursuant to U.S.S.G. 5E1.2(c), plus $122,344 for

the cost of his imprisonment, and $3,954 for the cost of his

supervision. Patriarca, 807 F. Supp. at 210. The later

-35-

portion of the fine was assessed pursuant to U.S.S.G.

5E1.2(i), which states the following:

Notwithstanding the provisions of subsection (c)
[the minimum-maximum fine table] of this section,
but subject to the provisions of subsection (f)
[the defendant's ability to pay] herein, the court
shall impose an additional fine amount that is at
least sufficient to pay the costs to the government
of any imprisonment, probation, or supervised
release ordered.

U.S.S.G. 5E1.2(i). Patriarca contends that the Sentencing

Reform Act, 18 U.S.C. 3553(a), does not authorize

imposition of a fine to recompense the government for the

cost of incarceration or supervised release, and 5E1.2(i)

is therefore invalid.

The few circuit courts to have addressed this

question agree that the Sentencing Reform Act does not

authorize the assessment of a fine solely to pay for the

costs of a defendant's imprisonment. United States v.

Spiropoulos, 976 F.2d 155, 165-69 (3d Cir. 1992); United

States v. Hagmann, 950 F.2d 175, 187 n.29 (5th Cir. 1991),

cert. denied, 113 S. Ct. 108 (1992). They disagree, however,

as to whether 5E1.2(i) can be justified on other grounds.

Compare United States v. Turner, No. 93-1148, 1993 U.S. App.

LEXIS 17472 (7th Cir. July 14, 1993) (costs of confinement

reflect seriousness of the crime and increase deterrence) and

Hagmann, 950 F.2d at 187 ("the uniform practice of fining

criminals on the basis of their individualistic terms of

imprisonment an indicator of the actual harm each has

-36-

inflicted upon society is a rational means to assist the

victims of crime collectively") with Spiropoulos, 976 F.2d at

168 ("The cost of imprisoning a defendant has little, if

anything, to do with the amount that the defendant has harmed

his or her victim(s), and is therefore questionable as an

appropriate method of restitution."); see United States v.

Doyan, 909 F.2d 412, 416 (10th Cir. 1990) ("Whether the

purpose of the contested fine is to punish, deter, or to

spare the taxpayers a substantial expense that has been

generated by an intentional criminal act, we cannot say that

Guideline 5E1.2(i) as applied here bears no rational

relation to the legitimate governmental interest in criminal

justice."). The government here argues that 5E1.2(i) is

merely a means of achieving the clearly authorized purpose of

punishing a defendant based on the seriousness of his or her

offense.

We do not find it appropriate to answer this

question at the present time. First, Patriarca did not

object to his cost-of-imprisonment fine at the time of

sentencing. Hence, the district court had no reason to focus

on the issue, and we lack the benefit of its considered

views. Absent plain error, we normally will not consider an

issue raised for the first time on appeal. See United States

v. Newman, 982 F.2d 665, 672 (1st Cir. 1992), petition for

cert. filed, 61 U.S.L.W. 3751 (U.S. April 22, 1993) (No. 92-

-37-

1703); United States v. Haggert, 980 F.2d 8, 11 (1st Cir.

1992); United States v. Mondello, 927 F.2d 1463, 1468 (9th

Cir. 1991) (refusing to consider argument not raised below

that the fine provisions of the Guidelines are contrary to

statutory authorization). Because the fine issue is one

which has divided our sister circuits, we cannot see that the

district court's alleged error in assessing the 5E1.2(i)

fine was a "plain" one within the meaning of Fed. R. Crim. P.

52(b). See United States v. Olano, 113 S. Ct. 1770, 1777

(1993).

In addition, our decision that Patriarca must be

resentenced taking into account uncharged relevant conduct

requires that we also vacate the fine portion of Patriarca's

sentence. Should the district court on remand determine that

Patriarca must be sentenced at a higher base offense level,

his minimum and maximum fine range under 5E1.2(c) will

likewise increase. Moreover, Patriarca's cost of

imprisonment necessarily depends upon the length of his

confinement. On remand, Patriarca can argue that a cost-of-

imprisonment fine under 5E1.2(i) is inconsistent with the

Sentencing Reform Act. Should the district court reject the

argument and Patriarca again appeal from the fine, that will

be the appropriate time for this court to decide the

question. Presently, however, because we must vacate the

fine and because Patriarca did not raise the issue below

-38-

hence failing to bring the claimed error to the district

court's attention for focused consideration we find it

inappropriate to decide whether 5E1.2(i) is valid.

II. Carrozza's Sentence

Defendant/appellant Robert F. Carrozza appeals from

a judgment of conviction and a 228-month sentence imposed by

the district court, after Carrozza pleaded guilty to 49

counts of racketeering-related offenses, including violations

of the RICO statute, extortion, kidnapping, loansharking,

narcotics distribution, gambling, obstruction of justice, and

intimidation of a witness. Carrozza argues that the district

court's decision to "assume" that Carrozza's base offense

level should be adjusted upwards for his role in the offense

constituted plain error.

After extensive plea negotiations, Carrozza and

four of his codefendants entered into plea agreements with

the government. Pursuant to Fed. R. Crim. P. 11(e)(1)(C),

Carrozza and the government agreed that a specific sentence

of 228 months was "the appropriate disposition of the case,"

constituting "a justifiable departure within the meaning of

6B1.2(c)(2) of the United States Sentencing Guidelines."

Both parties agree on appeal that this "justifiable

departure" was understood to have been a downward departure.

-39-

Apart from the agreed sentence, Carrozza received

two additional benefits in exchange for his plea of guilty.

First, the government promised not to prosecute Carrozza for

his alleged involvement in the murder of William Grasso and

the attempted murder of Francis Salemme, Sr. Second, the

government promised that Carrozza would not be subpoenaed to

testify in any federal grand jury investigation in the

District of Massachusetts relating to the activities of the

PatriarcaFamily occurringbefore thedate of theplea agreement.

The plea agreements for all five defendants were

made expressly contingent upon the district court's

acceptance of the pleas of guilty from each defendant.

According to the government, the interdependency of the plea

agreements reflected the government's major purpose in

entering the agreements eliminating the need for any

trial, which the parties estimated would take from six months

to a year or more. Because removing some but not all of the

defendants would not significantly reduce the time necessary

to try the case, the government bargained for, and obtained,

the option to withdraw all five plea agreements if any of the

defendants moved successfully to withdraw his plea.

The district court conditionally accepted the

guilty pleas pending consideration of the presentence reports

("PSR"). The preliminary PSR for Carrozza was completed on

April 3, 1992. The preliminary PSR calculated his applicable

-40-

guideline range, based on an offense level of 33 and a

criminal history category of IV, to be 188-235 months, and

therefore concluded that the agreed sentence of 228 months

was consistent with the guidelines. The PSR determined that

there were no factors warranting departure.

On April 9, the government filed its objections to

this PSR, complaining that some of the PSR's calculations of

Carrozza's offense level were too high and some were too low.

The key objection made by the government was that the PSR

should have made an upward adjustment pursuant to U.S.S.G.

3B1.1(a) for Carrozza's role as an organizer or leader in

several of the offenses charged. The government calculated

the applicable guideline range to be 235-293 months, based

upon an offense level of 35 and a criminal history category

of IV. Finally, the government argued that there were

justifiable factors to support a downward departure.

Carrozza filed several specific objections to the

PSR on April 17. Although Carrozza did not discuss the

particulars of his own calculation of the applicable

guideline range, he did argue that "a downward departure to

the agreed upon sentence" was warranted. Carrozza did not

dispute the government's calculations as to his role in the

offenses charged.

The Addendum to the PSR was completed on April 23.

The Addendum accepted some of the government's objections

-41-

calling for a downward revision in the offense level

calculations, but rejected the government's role in the

offense objection because the government had not provided

"sufficient information . . . in the details of the

particular episodes to delineate the individual roles of the

defendant within those episodes." The Addendum recalculated

the total offense level to be 31, yielding a guideline range

of 151-188 months. The Addendum noted that this range would

require "an upward departure if the Court were to sentence

the defendant to the amount of time designated in the plea

agreement [228 months]."

On the same day that the Addendum to the PSR was

disclosed, the government and Carrozza filed separate

sentencing memoranda, each arguing to the court that the

agreed upon sentence constituted a justifiable downward

departure.

The sentencing hearing was held on April 29, 1992.

At the outset of the sentencing hearing, the court explained

that under Rule 11(e)(1)(C), it could either accept the plea

agreements and impose the agreed-upon sentence in each case,

or reject the agreements and offer the defendants an

opportunity to withdraw their pleas. The court clearly

articulated the disparate guideline ranges calculated by the

government and the probation office and then stated:

I think the most sensible thing to do is
to not resolve that dispute but to decide

-42-

whether the 228-month sentence, which I
think is about 19 years, if it is,
indeed, an eight-month downward departure
as the Government intends, is
appropriate. . . .

Well, I am going to proceed . . . in the
following fashion: I am not deciding
whether the Guidelines are 151 months to
188 months or [if] Probation's
calculation is followed, which would
involve 40-month upward departure or
whether, as the Government contends, that
Mr. Carrozza has assumed up to now, [or]
at least up to the time of his plea, the
calculations might be 235 to 293 months.

I am going to analyze this in the context
of the question being whether if the
Guidelines are 235 [to] 293 months, the
seven-month downward departure to 228
months [as] called for by the plea
agreement is justifiable.

The court explained that it was not resolving the dispute

because Fed. R. Crim. P. 32 does not require resolution of

issues that will not be material to the sentence to be

imposed. When asked if anyone objected to this

procedure, the parties responded "no." Consistent with their

prehearing positions, both Carrozza and the government argued

that the agreed upon sentence represented a justifiable

downward departure from the applicable guideline range.

The court thereafter sentenced Carrozza to 228

months imprisonment, to be followed by 60 months supervised

release. On the same day, the district court entered an

order relating to the presentence reports. In this order,

the court stated that one of the justifications for its

-43-

downward departures for several of the defendants was that

the departures "eliminated the need for both a lengthy trial

(which it was estimated would take six months to a year) and

for protracted sentencing hearings to resolve disputes

relevant to the term of incarceration to be imposed on each

defendant."

On April 30, 1992, the court entered its "Second

Order Relating to Presentence Report" in Carrozza's case. In

that order, the court expressly relied on Fed. R. Crim. P.

32(c)(3)(D)(ii) as its justification for failing to calculate

the sentencing guideline range applicable to Carrozza:

With regard to the government's
objections to the PSR, the court,
pursuant to Fed. R. Crim. P.
32(c)(3)(D)(ii), did not decide whether
the applicable Sentencing Guidelines were
235 to 293 months as asserted by the
government or 151 to 188 months as
recommended by the Probation Officer.
Rather, the court assumed the Sentencing
Guidelines were a minimum of 235 months
and agreed with the government and the
defendant that if the binding plea
agreement, pursuant to Fed. R. Crim. P.
11(c)(1)(C) [sic], calling for a sentence
of 228 months represented a departure,
there were justifiable reasons for it.
Thus, the agreed-upon 228 month sentence
was imposed.

Judgment was entered on May 1, 1992.

Notwithstanding the court's previous assertions that it was

merely "assuming" that the government was correct, the

judgment indicates that the court found the guideline range

to be 235-293 months and imposed a downward departure for

-44-

justifiable reasons. In a May 7, 1992 memorandum explaining

its sentence, the court once again stated its basic

assumption:

In the Presentence Report, the Probation
Department calculated Carrozza's
Sentencing Guidelines to 151 to 188
months. The government, however,
contended that the proper calculation of
Carrozza's Sentencing Guidelines was 235
to 293 months. Carrozza's plea agreement
specified a sentence of 228 months, or 19
years, in prison. The court analyzed his
plea agreement on the assumption that the
required sentence represented a seven
month downward departure.

On appeal, Carrozza contends that the sentencing

procedure employed by the district court was patently

unlawful because the court failed to determine the applicable

guideline range.

A. Plain Error Standard12

12. In its jurisdictional statement, the government
questions whether this court has jurisdiction over the
instant appeal. The government notes that a defendant may
only appeal a sentence pursuant to a Rule 11(e)(1)(C) plea
agreement on the grounds that the sentence was imposed in
violation of law or as a result of an incorrect application
of the guidelines. 18 U.S.C. 3742(c). In his
jurisdictional statement, Carrozza asserts only that the
sentence was in violation of the law. Because Carrozza
provides no authority for the proposition that a claim such
as he raises of procedural error in determining a sentence
may rise to the level of a claim that the resulting sentence
was imposed in violation of the law, the government argues
that this court is without jurisdiction to consider the
appeal. Regardless whether the district court's error rises
to the level of a violation of law, Carrozza clearly argues
in his brief that the district court failed to apply the
guidelines correctly when it "assumed" a role in the offense
adjustment. That is sufficient to give this court
jurisdiction to decide this appeal. See United States v.

-45-

Carrozza concedes that because he failed to object

to the district court's course of conduct during the

sentencing hearing, his sentence can be reversed only upon a

showing of plain error. See Fed. R. Crim. P. 52(b).

Carrozza has failed to make such a showing here.

The Supreme Court recently interpreted the plain

error rule in United States v. Olano, 113 S. Ct. 1770 (1993).

In Olano, the Court reiterated the three limitations on

appellate authority to recognize errors under Fed. R. Crim.

P. 52(b): (1) there must be an "error," (2) the error must

be "plain," and (3) the error must "affec[t] substantial

rights." Id. at 1777-78. Even if a defendant can establish

all three criteria, an appellate court has discretion not to

review the error because Rule 52(b) is written in permissive,

not mandatory, terms. Id. at 1778. The standard to guide

that discretion was stated in United States v. Atkinson, 297

U.S. 157, 160 (1936): appellate courts should correct plain

forfeited errors affecting substantial rights if the errors

"seriously affect[] the fairness, integrity or public

reputation of judicial proceedings." Olano, 113 S. Ct. at

1779.

We agree with Carrozza that the district court

committed error when it "assumed" that Carrozza's guideline

Smith, 918 F.2d 664, 668-69 (6th Cir. 1990) (upholding the

right of a defendant to file a similar appeal under 18 U.S.C.
3742(a)(1) or (a)(2)), cert. denied, 111 S. Ct. 1088 (1991).

-46-

range was 235-293 months prior to its "downward" departure to

228 months. Before accepting a plea agreement that contains

a specific sentence under Fed. R. Crim. P. 11(e)(1)(C), a

sentencing court is required to satisfy itself either that:

"(1) the agreed sentence is within the applicable guideline

range; or (2) the agreed sentence departs from the applicable

guideline range for justifiable reasons." U.S.S.G.

6B1.2(c). To determine whether the sentence departs from the

applicable guideline range for justifiable reasons, the court

must first determine what the applicable guideline range is

and then analyze whether a departure is authorized by 18

U.S.C. 3553(b) and the general departure rules in Chapter

1, Part A (4)(b) of the Guidelines. See U.S.S.G. 6B1.3,

Commentary. In effect, 6B1.2(c) instructs courts to apply

general guideline principles when determining whether to

accept a plea under Fed. R. Crim. P. 11(e)(1)(C). See

U.S.S.G. 1B1.1 (general instructions on applying the

guidelines).13

13. The government argues that Carrozza has waived his right
to have the district court determine an actual guideline
range by expressly agreeing to the district court's decision
to assume a guideline range. A deviation from a legal rule
is not considered an "error" if that legal rule has been
waived, as opposed to merely forfeited. See Olano, 113 S.

Ct. at 1777 ("Whereas forfeiture is the failure to make the
timely assertion of a right, waiver is the intentional
relinquishment or abandonment of a known right.") (internal
quotations omitted). We doubt that the sentencing guidelines
can be waived. For example, we suspect that an agreement
between the government and a defendant not to apply the
guidelines would be ineffective. Because of doubts that the

-47-

In sentencing Carrozza, the district court

mistakenly believed that Fed. R. Crim. P. 32(c)(3)(D)

authorized its decision not to determine an actual guideline

range for Carrozza's offenses. As we have stated, this was

error. Rule 32(c)(3)(D)14 apparently relates to factual

inaccuracies in a presentence report, not to mixed questions

of law and fact that a defendant does not dispute. See

United States v. Hand, 913 F.2d 854, 857 (10th Cir. 1990)

(defendant's disagreement over PSR's legal conclusion that

defendant was not a minor participant does not allege factual

inaccuracies in the PSR and does not implicate Rule

32(c)(3)(D)). But see United States v. Rosado-Ubiera, 947

F.2d 644, 646 (2d Cir. 1991) (Rule 32(c)(3)(D) was violated

sentencing guidelines are waivable, we rest our decision
today on Carrozza's failure to establish that the district
court's error affects substantial rights, and on our
discretion not to recognize plain errors even when they do
affect substantial rights.

14. Fed. R. Crim. P. 32(c)(3)(D) provides in pertinent part
the following:

If the comments of the defendant and the

defendant's counsel or testimony or other information
introduced by them allege any factual inaccuracy in the

presentence investigation report or the summary of the
report or part thereof, the court shall, as to each

matter controverted, make (i) a finding as to the

allegation, or (ii) a determination that no such finding
is necessary because the matter controverted will not be
taken into account in sentencing.

Fed. R. Crim. P. 32(c)(3)(D) (emphasis added).

-48-

when court failed to resolve the defendant's precise role in

the offense).

To be sure, a district court has inherent power not

to decide disputes that are immaterial or irrelevant to the

ultimate sentence. For example, a sentencing court need not

determine whether prior convictions should be added to a

defendant's criminal history score if the addition will not

affect the defendant's criminal history category. See United

States v. Lopez, 923 F.2d 47, 51 (5th Cir.), cert. denied,

111 S. Ct. 2032 (1991). We have also held that a sentencing

court need not choose between two overlapping guideline

ranges when the same sentence would have been imposed under

either range. United States v. Ortiz, 966 F.2d 707, 718 (1st

Cir. 1992), cert. denied, 113 S. Ct. 1005 (1993); United

States v. Concemi, 957 F.2d 942, 953 (1st Cir. 1992); United

States v. Bermingham, 855 F.2d 925, 934 (2d Cir. 1988). Here

however, the two ranges did not overlap, nor was the

sentencing factor immaterial to Carrozza's guideline range.

Instead, if the disputed factor was decided in the

government's favor, Carrozza's sentencing range would be 235-

293 months, but if the issue was decided as the probation

office recommended, Carrozza's guideline range would be 151-

188 months.

We have also intimated in the past that if a

sentencing court intends to depart, an error in applying the

-49-

guidelines may prove to be harmless if the court makes clear

that it would have departed to the same sentence regardless

of the exact guideline range. United States v. Plaza-Garcia,

914 F.2d 345, 347 (1st Cir. 1990). We have never, however,

suggested that a sentencing court need not decide a

sentencing factor when one decision will result in an upward

departure and another in a downward departure. Such a rule

would be inimical to the very principle behind guideline

departures. United States v. McCall, 915 F.2d 811, 814 n.3

(2d Cir. 1990) (rejecting government's argument that

incorrect application of guidelines, resulting in range of

151-188 months instead of 87-108 months, was irrelevant to

court's ultimate sentence because court indicated an intent

to depart down for substantial cooperation an indication

that could not be reconciled with court's 108-month sentence,

which was at the high end of the correct guideline range).

The district court, therefore, erred when it simply

assumed that Carrozza's guideline range was 235-293 months,

and ignored the probation office's suggestion that the range

should be 151-188 months. And while we can understand and

sympathize with the district court's desire to avoid an

obtuse decision that may have seemed academic, we think the

error was "plain" in the sense that it was both "clear" and

"obvious." See Olano, 113 S. Ct. at 1777. That is enough to

-50-

pass the second hurdle to appellate authority under Rule

52(b).

We now turn to the third and often deciding factor

in our plain error analysis whether the error affects

substantial rights. In most cases, "although perhaps not in

every case, the defendant must make a specific showing of

prejudice to satisfy the 'affecting substantial rights' prong

of Rule 52(b)." Olano, 113 S. Ct. at 1778. For several

reasons, we think Carrozza has not made such a showing here.

First, Carrozza has not argued, and points to no

evidence suggesting, that an actual adjustment for his role

in the offense would have been improper. Instead, Carrozza

merely assumes that the district court's "assumption" was in

fact wrong, and argues that he was prejudiced because his

actual guideline range might have been years shorter than

that assumed by the district court. However, analysis of the

record reveals that, in all likelihood, the district court's

assumption that Carrozza's base offense level was 35 was

correct.

The difference between the government's and the

probation office's calculations of Carrozza's base offense

level resulted entirely from whether or not an upward

adjustment should have been given for Carrozza's role in the

drug conspiracy. The probation office assigned a level 26 to

Carrozza's drug trafficking activity. The government argued

-51-

that this level should be increased by four levels to 30

because Carrozza was an organizer/leader of this activity and

because the activity involved more than five participants.

See U.S.S.G. 3B1.1(a). Because Carrozza's narcotics

activities yielded the highest offense level among Carrozza's

various offenses and, therefore, served as a starting point

for the multiple count analysis under U.S.S.G. 3D1.4, the

difference was crucial. Applying the multiple count

analysis, both the probation office and the government added

five levels the probation office arriving at a total

offense level 31 and a guideline range of 151-188 months, and

the government calculating a total offense level 35 and a

guideline range of 235-293 months.

The probation office rejected the government's

request for a role in the offense adjustment for any of

Carrozza's offenses, contending that there was insufficient

evidence as to Carrozza's role in the individual offenses to

make such a determination. While the specifics with regard

to Carrozza's role in his bookmaking and extortion offenses

are rather sketchy, the government provided more than

sufficient evidence that Carrozza directed the narcotics

activities of five or more participants. The government's

104-page factual submission to the probation office is

replete with evidence that Carrozza directed and organized

the drug trafficking conspiracy. Given this evidence, it is

-52-

understandable why Carrozza completely neglected to argue the

propriety of a role in the offense adjustment in his

appellate brief and below. Since it is Carrozza's burden to

establish that the district court's error affected

substantial rights, his failure to argue that a four-level

role in the offense adjustment would have been improper,

combined with the fact that an adjustment would have been

appropriate at least with respect to the crucial narcotics

conspiracy, undermines Carrozza's claim of prejudice. To be

sure, a role in the offense adjustment is a mixed question of

law and fact. In most instances, an appellate court will not

examine such questions in the first instance. We make the

analysis only to indicate the unlikelihood that Carrozza was

prejudiced by the district court's failure to decide the

issue.

A further reason for finding no error affecting

substantial rights is the significant benefits Carrozza

received in exchange for his plea of guilty. In exchange for

Carrozza's agreement to a 228-month sentence, the government

promised not to prosecute Carrozza for his alleged

involvement in the murder of William Grasso an offense

that could carry a sentence of life imprisonment and the

attempted murder of Frank Salemme, Sr. In addition, the

government promised not to subpoena Carrozza to testify in

any federal grand jury investigation in the District of

-53-

Massachusetts relating to the activities of the Patriarca

Family. This later promise was probably significant to

Carrozza, who, as a made member of the Patriarca Family, had

taken the oath of "omerta" to protect the secrets of the

Patriarca Family of La Cosa Nostra to his grave. In light of

the significant benefits Carrozza received from the plea

agreement, it is difficult to see how he was prejudiced by

the district court's acceptance of his plea and sentencing

him to a term of imprisonment upon which he had specifically

agreed. See United States v. Ybabez, 919 F.2d 508, 510 (8th

Cir. 1990) ("We do not discern a miscarriage of justice when

a defendant receives the sentence he bargained for in a plea

agreement."), cert. denied, 111 S. Ct. 1398 (1991).

Finally, even if Carrozza were able to establish

some form of prejudice from the district court's failure to

address his role in the offense and thereby pass the third

and final hurdle of appellate authority under Fed. R. Crim.

P. 52(b), the case would be an inappropriate one for us to

exercise our discretion to recognize plain forfeited errors.

The Supreme Court has made clear on numerous occasions that

courts of appeals should correct plain forfeited errors

affecting substantial rights only if the errors "'seriously

affect[] the fairness, integrity or public reputation of

judicial proceedings.'" Olano, 113 S. Ct. at 1779 (quoting

Atkinson, 297 U.S. at 160). We see no such serious effect

-54-

here. Carrozza failed to object in circumstances strongly

indicative that he wished to accept the compromise sentence

because of the benefits it conferred. The attendant

circumstances do not reflect discreditably upon the fairness,

integrity or public reputation of the proceeding.

We vacate Patriarca's sentence and remand for

resentencing in accordance with this opinion. Carrozza's

sentence is affirmed.

-55-